ATTORNEY FOR APPELLANT
Jim Brugh
Logansport, Indiana

ATTORNEY FOR APPELLEE
TED FRANKLIN, AS MAYOR OF THE
CITY OF LOGANSPORT
Mark J. Crandley
Barnes & Thornburg, LLP
Indianapolis, Indiana

ATTORNEY FOR APPELLEE
COMMON COUNCIL OF THE CITY
OF LOGANSPORT
John R. Molitor
Indianapolis, Indiana

FILED
Nov 13 2013, 1:33 pm
CLERK
of the supreme court,
court of appeals and
tax court

# In the
# Indiana Supreme Court

No. 09S00-1307-PL-476

JULIE KITCHELL,

*Appellant (Plaintiff below),*

v.

TED FRANKLIN, AS THE MAYOR OF THE
CITY OF LOGANSPORT, AND THE COMMON
COUNCIL OF THE CITY OF LOGANSPORT,

*Appellees (Defendants below).*

Appeal from the Cass Superior Court, No. 09D02-1303-PL-00011
The Honorable Rick A. Maughmer, Judge

In the Indiana Court of Appeals, No. 09A02-1305-CT-414

On Emergency Transfer Pursuant to Indiana Appellate Rule 56(A)

**November 13, 2013**

**Rucker, Justice**

In this case we address whether Indiana's Public-Private Agreements statute requires a local legislative body to first adopt the statute before it may issue a request for proposals or begin contract negotiations as provided for under the statute. We hold it does not.

## Background

In the first half of the nineteenth century a number of federal, state, and local governmental entities entered into ventures with private businesses to build railroads and canals in an effort to promote economic growth. The public entities raised money to invest in private companies, not only by issuing bonds but by extending credit and guaranteeing loans with insufficient collateral as security. Many of these projects failed. When they did, the public entities suffered severe financial difficulties. In response, they adopted limitations on debt and restrictions on extensions of credit to private parties. Accordingly, public entities were no longer allowed to incur debt unless it was authorized by law with an annual tax sufficient to pay the interest on the debt as it fell due, to be paid off within a specified number of years. See generally Clayton P. Gillette, Constitutional and Statutory Aspects of Municipal Debt Finance: Recent Developments, Practicing Law Institute, Tenth Annual Institute on Municipal Finance: Financing State and Local Governments in the 1990's, 377 PLI/REAL 9 (1991); Stewart E. Sterk and Elizabeth S. Goldman, Controlling Legislative Shortsightedness: The Effectiveness of Constitutional Debt Limitations, 1991 Wis. L. Rev. 1301 (1991).

Indeed Indiana's second constitutional convention was partially a product of the overwhelming debt the State had incurred under its "internal improvement system," which included the construction of canals, turnpikes, and railroads. N. Ind. Bank & Trust Co. v. State Bd. of Fin., 457 N.E.2d 527, 529 (Ind. 1983). See also David J. Bodenhamer and Randall T. Shepard, The Narratives and Counternarratives of Indiana Legal History, in The History of Indiana Law 7, 9 (David J. Bodenhamer and Randall T. Shepard, eds., 2006). In consequence the 1850 convention passed, and the voters later ratified, a constitutional debt limit which provides in relevant part, "No political or municipal corporation in this State shall ever become indebted, in any manner or for any purpose, to an amount, in the aggregate, exceeding two per centum on the value of the taxable property within such corporation . . . ." See Ind. Const. art. 13, §1. A constitutional debt limit "place[s] constraints on governmental borrowing power to

2

protect present and future taxpayers from the excesses of legislative fiscal irresponsibility." Reuven Mark Bisk, Note, State and Municipal Lease-Purchase Agreements: A Reassessment, 7 Harv. J.L. & Pub. Pol'y 521, 521 (1984). This means that government entities must struggle both to "fulfill their governmental responsibilities and avoid violating debt limitations." Id.

The Indiana General Assembly has enacted various statutes that provide creative mechanisms allowing municipal corporations and political subdivisions to finance public projects in a manner that does not violate Indiana's constitutional debt limitations. See Adolph H. Zwerner, Indiana Municipal Revenue Bond Financing, 12 Ind. L.J. 266, 274-78 (1937) (enumerating legislative enactments); cf. Bisk, supra, at 522 (recognizing lease-purchase agreements as a common mechanism employed by elected officials). One of these Indiana mechanisms is commonly referred to as the Public-Private Agreements Act (the "Act"). See Ind. Code §§ 5-23-1-1 through 5-23-7-2. Among other things the Act "permits agreements between a governmental body and a private operator to construct, operate, and maintain a public facility." City of Gary Common Council v. White River Envtl. P'ship – Gary, 713 N.E.2d 893, 894 (Ind. Ct. App. 1999).

First enacted in 1995[1] the Act authorizes and provides guidelines for the implementation of what are known as "public-private partnerships" which can be described as:

> "Contractual agreement[s] formed between public and private sector partners, which allow[ ] more private sector participation than is traditional. The agreements usually involve a government agency contracting with a private company to renovate, construct, operate, maintain, and/or manage a facility or system." [Public-private partnerships or "PPPs"] cover as many as a dozen types of innovative contracting, project delivery and financing arrangements between public and private sector partners. In PPPs, the private sector performs functions normally undertaken by the government, but the public sector remains ultimately accountable for the facility and the overall service to the public.

Jaime Rall, et al., Nat'l Conference of State Legislatures, Public-Private Partnerships for Transportation: A Toolkit for Legislators 1 (2010) (quoting U.S. Dep't of Transp., Report to

---

[1] Originally codified as Indiana Code sections 36-1-14.3-1 to -12, the statute was repealed and replaced in 1998 by Indiana Code sections 5-23-1-1 through 5-23-7-2.

Congress on Public-Private Partnerships (2004)).  Despite their name, public-private partnerships rarely take the legal form of a partnership but rather function as government procurement agreements.  Dominique Custos & John Reitz, Public-Private Partnerships, 58 Am. J. Comp. L. Supp. 555, 559-60 (2010) (footnote omitted).  These arrangements are attractive to governmental entities because they enable the entities to "shift much of the financing, maintenance, and/or operating costs for public infrastructure to private contractors, who may then be allowed to recoup their costs through tolls or other user payments, thus enabling the government to use the market to accomplish its purposes and to relieve public budgets of the financial burden associated with infrastructure upgrading and maintenance."  Id. at 555.

In relevant part, Indiana's Public-Private Agreements Act "applies to" among other entities "[a] political subdivision in a county where . . . the legislative body of the political subdivision . . . adopts the provisions of this article by resolution or ordinance."  I.C. § 5-23-1-1 (3).  The Act requires "the governmental body to request proposals under this chapter before entering into the public-private agreement," I.C. §  5-23-5-1, and after receiving proposals to "negotiate the best and final offers of responsible offerors who submit proposals that are determined to be reasonably susceptible of being selected for a public-private agreement."  I.C. § 5-23-5-7.  The Act further provides in pertinent part:

> If a recommendation to award the public-private agreement is made to the board, the board shall schedule a public hearing on the recommendation and publish notice of the hearing one (1) time in accordance with IC 5-3-1 at least seven (7) days before the hearing. The notice shall include the following:
>
> (1) The date, time, and place of the hearing.
>
> (2) The subject matter of the hearing.
>
> (3) A description of the public-private agreement to be awarded.
>
> (4) The recommendation that has been made to award the public-private agreement to an identified offeror or offerors.
>
> (5) The address and telephone number of the board.
>
> (6) A statement indicating that the proposals and an explanation of the basis upon which the recommendation is being made are

4

available for public inspection and copying at the principal office of the board during regular business hours.

I.C. § 5-23-5-9. Finally, the Act provides "[a]fter the procedures required in this chapter have been completed, the board shall make a determination as to the most appropriate response to the request for proposals and may award the public-private agreement to the successful offeror or offerors." I.C. § 5-23-5-11.

## Facts[2] and Procedural History

The City of Logansport is exploring a means to replace an existing coal powered electric facility with one that will generate electricity primarily through refuse-derived fuels. This process uses recycled solid waste to produce energy. The replacement plant will also use natural gas as a backup fuel source. This modernized power plant will be more environmentally sound, provide more capacity to generate electricity, allow for potentially lower rates to the City's ratepayers, and aid in economic development by providing affordable energy to potential new employers.

To determine how to employ this technology in the most cost-effective manner, the City studied the possibility of entering a public-private partnership with an entity that could construct, operate, and maintain a public facility and transfer it back to City at a future date. On November 28, 2012 the City—through its Utility Service Board (the "Board")—issued a request for proposals ("RFP") seeking:

> [A] provider to enter into a public-private agreement . . . with the City of Logansport . . . through its Utility Service Board . . . under the provisions of I.C. 5-23 . . . for the purpose of design, construction, financing, maintenance and transfer to the City, [a project to] consist of . . . converting the two existing coal-fired steam turbine generators . . . to utilize refuse derived fuel pellets . . . as their primary fuel, with natural gas backup.

---

[2] Because this case comes before us upon a motion to dismiss, the facts set forth herein are taken from the plaintiff's pleadings which include attached exhibits.

App. at 12.  The project also called for the expansion of the utility's generating capacity.  Id. After reviewing proposals submitted by six vendors in response to the RFP and after discussing and negotiating with the offerors, at a public hearing the Board recommended that the City execute a memorandum of understanding with Pyrolyzer, LLC to undertake the project.  The Logansport Common Council accepted the Board's recommendation and on February 14, 2013 (after a first reading) and March 4, 2013 (after a second reading) passed Ordinance No. 2013-07 authorizing the mayor to enter into a memorandum of understanding and negotiate an agreement with Pyrolyzer.  Among other things the Ordinance declared:

> Pursuant to Ind. Code § 5-23-5-11, the Executive is hereby authorized, on behalf of the City, to enter into a Memorandum of Understanding with the Operator. . . .  Upon execution of a Memorandum of Understanding with the Operator, the Executive is further authorized to negotiate a BOT Agreement with the Operator[3], all in accordance with the provisions of Ind. Code §§ 5-23-1-1—5-23-7-2.

App. at 26.  Also on March 4, 2013, the Council passed Resolution No. 2013-08 adopting the Public-Private Agreement Act specifically declaring:

> [T]he [Council] has pending before it a proposed ordinance that would accept the aforesaid recommendation of its Utilities Service Board [to pursue an agreement with Pyrolyzer], and accordingly the Council now desires, pursuant to Ind. Code § 5-23-1-1, to formally adopt the provisions of the PPA Law and, pursuant to Ind. Code § 36-1-4-16, to formally ratify [the utility's] issuance of the RFP and all other acts heretofore taken by [the utility and the Board] in accordance with the PPA Law[.]

Id. at 29.

Julie Kitchell is a resident of the City of Logansport and is a ratepayer to the municipal utility that currently supplies her electricity.  On March 15, 2013 Kitchell filed a petition in the

---

[3] For purposes of the Act, "'BOT agreement' means any agreement between a governmental body and an operator to construct, operate, and maintain a public facility and to transfer the public facility back to the governmental body at an established future date."  I.C. § 5-23-2-3.  "'Operator' means a person who has entered into either an operating agreement or a BOT agreement with a governmental body to provide services to or on behalf of the governmental body."  I.C. § 5-23-2-8.

Cass Superior Court against Logansport Mayor Ted Franklin and the Common Council (referred to collectively as "City") seeking a declaration that Ordinance 2013-07 is invalid. The mayor filed a combined "Motion to Dismiss, Motion to Expedite and Motion for Award of Attorneys' Fees and Costs." Id. at 31. The motion to dismiss was based on Indiana Trial Rule 12(B)(6). A few days later on March 22, 2013 the Council filed its "Answer and Additional Defenses." Id. at 46. As to defenses, the City alleged, among other things: "The Petition fails to state a claim upon which relief may be granted [and the] Plaintiff lacks standing to file the Petition." Id. at 50. The mayor filed a memorandum in support of his motion to dismiss and Kitchell responded with a memorandum in opposition. The record does not reflect that a hearing was held on the motion. In any event, on April 10, 2013, the trial court entered an order granting the City's motion declaring in part: "Plaintiff fails to state a claim upon which relief can be granted." App. at 4.[4] Kitchell appealed and the City filed a verified motion to transfer jurisdiction to this Court under Appellate Rule 56(A).[5] After consideration, we granted the motion and assumed jurisdiction over the case.

---

[4] In its written order the trial court also set forth additional reasons for granting the motion to dismiss:

> 2. Logansport has adopted the provisions of Article 23, Title 5 of the Indiana Code.
>
> 3. The pleadings do not allege that the plaintiff sustained, or was in imminent danger of sustaining, some direct injury as a result of the conduct of either the Mayor or Common Council of the City of Logansport.
>
> 4. Logansport Ordinance No. 2013-07 is a valid exercise of municipal authority.

App. at 4. Contending that the issue of standing is implicated by the trial court's reason number three, both sides argue its propriety. Because we conclude the trial court's first asserted ground is dispositive, we decline to address any alternative rationale.

[5] The Rule provides:

> Motion Before Consideration by the Court of Appeals. In rare cases, the Supreme Court may, upon verified motion of a party, accept jurisdiction over an appeal that would otherwise be within the jurisdiction of the Court of Appeals upon a showing that the appeal involves a substantial question of law of great public importance and that an emergency exists requiring a speedy determination. If the Supreme Court grants the motion, it will transfer the case to the Supreme Court, where the case shall proceed as if it had been originally filed there. If a filing fee has already been paid in the Court of Appeals, no additional filing fee is required.

Ind. Appellate Rule 56(A) (emphasis omitted).

**Standard of Review**

"A motion to dismiss for failure to state a claim tests the legal sufficiency of the claim, not the facts supporting it." <u>Charter One Mortg. Corp. v. Condra</u>, 865 N.E.2d 602, 604 (Ind. 2007). Review of a trial court's grant or denial of a motion based on Trial Rule 12(B)(6) is therefore *de novo*. <u>Id.</u> When ruling on a motion to dismiss, "we view the pleadings in the light most favorable to the nonmoving party, with every reasonable inference construed in the non-movant's favor." <u>Babes Showclub, Jaba, Inc. v. Lair</u>, 918 N.E.2d 308, 310 (Ind. 2009). "[A] complaint may not be dismissed for failure to state a claim upon which relief can be granted unless it is clear on the face of the complaint that the complaining party is not entitled to relief." <u>City of New Haven v. Reichhart</u>, 748 N.E.2d 374, 377 (Ind. 2001).

**Discussion**

**I.**

In this case Kitchell contends that Ordinance 2013-07 is invalid because "the City did not have the authority to pass the ordinance." Br. of Appellant at 17. Kitchell insists that the Public-Private Agreements Act dictates that before the City could issue an RFP to enter into a public-private agreement, the City was first required to have an ordinance in place empowering itself to enter into such agreements. Noting that the City issued the RFP on November 28, 2012 and the Ordinance was not passed until March 4, 2013, Kitchell argues, "[l]egislation enabling a city to use the statutory Public-Private Agreement Law must come first; any RFPs, negotiations, or legislation must follow." <u>Id.</u> at 18. In essence, Kitchell complains about the sequence in which the Ordinance was passed. Kitchell continues, "the Ordinance is invalid because the City failed to take the mandatory first step in the multi-step procedure; that is, the City failed to empower itself to enter into a public-private agreement. Such ordinance or resolution of empowerment is a condition precedent to any effectiveness for the Ordinance." <u>Id.</u> at 13-14.[6] The City counters

---

[6] Kitchell also seems to imply the Ordinance is "deemed vetoed" because the Mayor failed to sign it "within ten (10) days after" its passage. <u>See</u> Br. of Appellant at 12; I.C. § 36-4-6-16(a), (b). In support of this claim Kitchell attached to her Appendix the affidavit of her attorney in this case which makes various bald assertions. This purported pleading, filed with the clerk of Cass Superior Court on June 6, 2013, was not a part of Kitchell's complaint for declaratory relief, which the trial court denied on April 10, 2013.

that the Act mandates no such "first step" but rather only requires that the City adopt the Act before actually entering into a public-private agreement. <u>See</u> Br. of Appellees at 8. And, according to the City as of the date of its Appellees' Brief (July 5, 2013) no such agreement has been reached.

We note in passing that Kitchell's focus on the Ordinance is misplaced. The Ordinance merely gave Mayor Franklin the authority to enter into a memorandum of understanding and to negotiate an agreement with Pyrolyzer. It is the Resolution—not the Ordinance—that incorporated the Public-Private Agreement Act into local law. In any event when interpreting a statute our goal is to determine and give effect to the intent of the legislature. <u>Porter Dev., LLC v. First Nat'l Bank of Valparaiso</u>, 866 N.E.2d 775, 778 (Ind. 2007). In determining legislative intent, we "consider the objects and purposes of the statute as well as the effects and repercussions of" our interpretation. <u>Bushong v. Williamson</u>, 790 N.E.2d 467, 471 (Ind. 2003). "The legislative intent as ascertained from the provision as a whole prevails over the strict literal meaning of any word or term." <u>Id.</u> Further, Courts may not "engraft new words" onto a statute or add restrictions where none exist. <u>See</u> <u>State ex rel. Monchecourt v. Vigo Cir. Ct.</u>, 162 N.E.2d 614, 616 (Ind. 1959) (refusing to infer the guardianship statute contained an additional requirement not in the plain language).

Kitchell's entire argument is premised on the tense of the verbs "applies" and "adopts." More precisely, Indiana Code section 5-23-1-1 provides in relevant part: "This article *applies* to . . . [a] political subdivision in a county where . . . the legislative body of the political subdivision . . . *adopts* the provisions of this article by resolution or ordinance." (emphasis added). According to Kitchell, because this provision uses present tense verbs, the legislature "obviously mean[t] that the acts of application [of the Act] and adoption [of the Act] are simultaneous." Br. of Appellant at 14. In support of her argument Kitchell cites authority for the proposition that:

> It is not unusual for state legislatures, especially in the *nonhome* rule states, to provide that a statute expressed in terms of general

Thus the affidavit is not a part of the record and played no part in the trial court's decision. Nor does it factor into our decision today. We remind counsel "[t]he purpose of an Appendix in civil appeals . . . is to present the Court with copies of only those parts of the record on appeal that are necessary for the Court to decide the issues presented." App. Rule 50(A).

application shall take effect in each local government only upon its acceptance by such entity, or by the governing body thereof. A vote of the designated body accepting the legislation for any particular local government is thus made a condition precedent to any effectiveness of the statute in that locality.

Id. at 14-15 (emphasis added and omitted) (quoting Antieau On Local Government Law § 25.21[1] (2d ed. 2012) (footnote omitted)).

Setting aside the fact that Indiana *is* a home rule state, see, e.g., Kole v. Faultless, 963 N.E.2d 493, 496 (Ind. 2012), thus calling into question the persuasiveness of the authority on which Kitchell relies, we note the home rule statute provides in relevant part: "[i]f there is a constitutional or statutory provision requiring a specific manner for exercising a power, a unit wanting to exercise the power must do so in that manner." I.C. § 36-1-3-6. The question in this case is whether the "specific manner" required before a City may exercise the power to enter a public-private agreement includes a sequencing requirement. We think not. And Kitchell puts more weight on the words "applies" and "adopts" than the Act can bear. It is certainly the case the legislature has set forth particular procedures that must be followed in order that a political subdivision may enter into a contract under the Act. For example, the RFP must contain certain language, offerors must be treated fairly and equally, and a public hearing must be held and notice of such hearing must be published in a particular way and contain particular language. I.C. §§ 5-23-5-2, -5, -9. But nowhere does the Act require a political subdivision to "adopt" the Act *before* taking any further action consistent with the Act. A reading of the Act as a whole indicates that it is designed to promote economic development which is executed in way that is transparent and open to public input and scrutiny. The record before us reflects that the City complied with the Act in every particular. Viewing the pleadings in the light most favorable to Kitchell, and with every inference construed in her favor, we conclude that as a matter of law Kitchell is not entitled to relief. Thus the trial court properly granted the City's motion to dismiss for failure to state a claim upon which relief can be granted.

## II.

The City requests an award of appellate attorneys' fees pursuant to Indiana Appellate Rule 66(E), which provides in part: "The Court may assess damages if an appeal, petition, or motion, or response, is frivolous or in bad faith. Damages shall be in the Court's discretion and may include attorneys' fees." But the City makes no argument and cites no authority that would support such an award in these circumstances. We thus decline to exercise our authority to award appellate attorneys' fees.

## Conclusion

We affirm the judgment of the trial court.

Dickson, C.J., and David, Massa and Rush, JJ., concur.