

FILED

Mar 13 2018, 5:25 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANTS

James Bopp, Jr.
Courtney Turner Milbank
The Bopp Law Firm, PC
Terre Haute, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Frances Barrow
Andrea E. Rahman
Deputy Attorneys General
Indianapolis, Indiana

ATTORNEYS FOR AMICI CURIAE
THE INDIANA HEALTH CARE
ASSOCIATION, HOOSIER OWNERS
& PROVIDERS FOR THE ELDERLY,
AND LEADINGAGE INDIANA

Mark J. Crandley
Barnes & Thornburg, LLP
Indianapolis, Indiana

Randall R. Fearnow
Quarles & Brady, LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Mainstreet Property Group,
LLC; Mainstreet Realty, LLC;
and 7105 E SR 334, LLC,

*Appellants-Plaintiffs,*

v.

Pam Pontones, in her official
capacity as Interim
Commissioner of the Indiana
State Department of Health;[1]
Terry Whitson, in his official
capacity as Assistant
Commissioner of the Indiana
State Department of Health,
Health Care Quality and
Regulatory; and Matt Foster, in
his official capacity as Director
of the Indiana State Department
of Health, Long Term Care
Division,

*Appellees-Defendants*

March 13, 2018

Court of Appeals Case No.
29A02-1704-MI-871

Appeal from the Hamilton Circuit
Court

The Honorable Paul A. Felix,
Judge

Trial Court Cause No.
29C01-1604-MI-3748

**Crone, Judge.**

# Case Summary

[1] Mainstreet Property Group, LLC ("Mainstreet Property Group"), Mainstreet

Realty, LLC ("Mainstreet Realty"), and Mainstreet Asset Management, LLC

("Mainstreet Asset Management") (collectively "Mainstreet") are entities under

---

[1] Kristina Box was appointed Commissioner of the Indiana State Department of Health in September 2017.

common control based in Carmel, Indiana. Mainstreet develops transitional care properties, which are classified and regulated as comprehensive care health facilities under Indiana law. In January 2015, a bill was introduced in the Indiana General Assembly for a moratorium ("Moratorium") on the licensure of comprehensive care health facilities by the Indiana State Department of Health ("ISDH"). The bill contained an exception for projects for which complete construction design plans had been submitted to ISDH by March 1, 2015. The March 1 deadline was added to the bill on March 9, at which point Mainstreet had nine ongoing projects for which they had not submitted the requisite plans. In four of those projects, Mainstreet Realty had executed contracts to purchase land, including from 7105 E SR 334, LLC, in Zionsville, but no real estate closings had been held. The bill became law in May 2015 and went into effect in July 2015. As a result of the Moratorium, Mainstreet Realty canceled all four contracts and did not execute purchase agreements or leases for the five remaining projects.

[2] Mainstreet Property Group, Mainstreet Realty, and 7105 E SR 334 (collectively "Appellants") filed a complaint for declaratory and injunctive relief against ISDH officials ("Appellees"), alleging that the Moratorium's retroactive deadline violated Indiana's vested rights doctrine as well as the contract and due process clauses of the United States and Indiana Constitutions. The trial court granted Appellees' motion to dismiss the contract and due process clause claims and, after a hearing, entered judgment for Appellees on the vested rights claim.

Appellants now challenge the trial court's rulings on the contract clause and vested rights claims. We hold that the Moratorium did not impair any contractual obligations or vested rights, and therefore we affirm.

## Facts and Procedural History[2]

Mainstreet Property Group, Mainstreet Realty, and Mainstreet Asset Management perform specific roles in the development of transitional care facilities, which are classified and regulated as comprehensive care health facilities under Indiana law.[3] Mainstreet Asset Management's employees manage the operations of both Mainstreet Realty, which acquires property for development, and Mainstreet Property, which develops the properties.[4] Mainstreet Realty and Mainstreet Property pay Mainstreet Asset Management for services that it provides to them on each project. Mainstreet has a five-stage development process consisting of (1) market analysis and selection, (2) site

---

[2] We heard oral argument on February 13, 2018. We thank the parties for their presentations.

[3] Indiana Code Section 16-28-2.5-3 defines a comprehensive care health facility as "a health facility that provides: (1) nursing care; (2) room; (3) food; (4) laundry; (5) administration of medications; (6) special diets; and (7) treatments; and that may provide rehabilitative and restorative therapies under the order of an attending physician."

[4] According to Appellants' complaint, Mainstreet Realty "is used as a holding company by Mainstreet Property Group." Appellants' App. Vol. 2 at 30.

> When a transitional care property is considered, [Mainstreet] Realty enters into a purchase agreement with a seller. [Mainstreet] Realty then holds the legal right to the property while additional steps of the development process are taken. Once all necessary steps are satisfied and the site is deemed usable, [Mainstreet] Realty transfers or assigns their rights to a wholly owned Mainstreet [Property Group] subsidiary.… [Mainstreet] Realty is bound by legal agreement to assign all rights it holds or acquires to the properties to be developed to Mainstreet [Property Group] or its wholly owned subsidiary.

*Id.* (citation omitted).

selection, (3) due diligence, (4) entitlements and design, and (5) permits and land.

[5] In January 2014, a bill was introduced in the General Assembly for a moratorium on ISDH's licensure of comprehensive care health facilities until a certain statewide care bed occupancy level was reached, with an exception for facilities under development as of June 30, 2014. *See* Senate Bill 173 (2014). The relevant portions of the bill were slated to become effective July 1, 2014, but the bill did not become law.

[6] In January 2015, another bill was introduced for a moratorium on ISDH's licensure of comprehensive care health facilities, with limited exceptions, including for facilities "under development" as of July 1, 2015. Ind. Code § 16-28-2.5-6(b)(1); *see* Senate Bill 460 (2015) (currently Ind. Code ch. 16-28-2.5).[5] The bill defined "under development" in pertinent part as referring to a health facility license application that meets all the following:

> (A) Funding to construct the comprehensive care health facility has been secured and is actively being drawn upon or otherwise used to further and complete construction.
>
> (B) Zoning requirements have been met.

---

[5] The Moratorium also applies to "[t]he certification of new or converted comprehensive care beds for participation in the state Medicaid program" unless the statewide care bed occupancy rate is more than ninety-five percent and to the "[t]ransfer between any comprehensive care facilities of licensed comprehensive care beds or comprehensive care bed certifications for participation in the state Medicaid program." Ind. Code § 16-28-2.5-6(a). Appellants do not focus on these provisions in their briefs.

(C) Complete construction design plans for the comprehensive care health facility have been submitted to [ISDH] and the [Indiana Department of Homeland Security's] division of fire and building safety *not later than March 1, 2015.* The construction design plans must be an accurate and true depiction of the comprehensive care health facility that the applicant intends to construct. However, the construction design plans may be modified to make technical changes, correct errors and omissions, or comply with zoning or other requirements from a governmental entity.

(D) Active and ongoing construction activities progressing to completion of the project are occurring at the project site.

Ind. Code § 16-28-2.5-5 (emphasis added). The March 1 deadline was added to the bill on March 9; thus, unlike the grandfather clause in Senate Bill 173, the grandfather clause in Senate Bill 460 was retroactive at its inception. The bill became law without the governor's signature on May 12 and went into effect on July 2.[6]

[7] On March 9, Mainstreet had nine projects in various stages of development for which it had not submitted the requisite plans by March 1. Between January 9 and February 18, Mainstreet Realty had executed land purchase agreements for four of those projects – located in Zionsville, Jeffersonville, Fort Wayne, and New Haven[7] – but no real estate closings had been held. For the five remaining

---

[6] The Moratorium was originally set to expire on June 30, 2018; in 2017, it was extended to June 30, 2019. Ind. Code § 16-28-2.5-8.

[7] According to the complaint, the Zionsville and Jeffersonville projects were in the permits and land phase of development, and the Fort Wayne and New Haven projects were in the entitlements and design phase. Appellants' App. Vol. 2 at 44.

projects – located in Hobart, Warsaw, Gary, Evansville, and Muncie[8] – Mainstreet Realty had not executed any purchase or lease agreements by March 9. Mainstreet Realty had not selected land parcels for the Evansville and Muncie projects and had not issued a letter of intent to a landowner for the Gary project. Between March 17 and April 29, Mainstreet submitted construction design plans for the Zionsville, Jeffersonville, Fort Wayne, New Haven, Hobart, and Warsaw projects, but ISDH did not act on them. As a result of the Moratorium, Mainstreet Realty canceled the four existing purchase agreements and did not execute purchase or lease agreements for the five remaining projects.

[8] In April 2016, Appellants filed a complaint for declaratory and injunctive relief against Appellees, alleging that the Moratorium violated Indiana's vested rights doctrine with respect to Mainstreet Property Group[9] and also violated the contract and due process clauses of the United States and Indiana Constitutions.[10] Pursuant to Indiana Trial Rule 12(B)(6), Appellees filed a motion to dismiss the complaint for failure to state a claim upon which relief

---

[8] According to the complaint, the Hobart and Warsaw projects were in the entitlements and design phase of development, and the Evansville, Gary, and Muncie projects were in the site selection phase. Appellants' App. Vol. 2 at 44.

[9] *See* Appellants' App. Vol. 2 at 49 (Appellants' complaint, which refers to Mainstreet Property Group as Mainstreet: "Mainstreet's rights were vested when they expended considerable resources to their substantial detriment relying in good faith on the law existing at the time their Projects began and/or on the original text of the legislators' introduced bill. The Moratorium impairs those vested rights and should be declared inapplicable to the aforementioned Projects in Indiana."). On appeal, Appellants refer to all three Mainstreet entities and 7105 E SR 334 as Mainstreet, whereas Appellees refer to Appellants as Mainstreet.

[10] The contract clause claims appear to encompass all three Appellants, although only Mainstreet Realty and 7105 E SR 334 were parties to any of the contracts at issue.

can be granted. The trial court summarily denied the motion as to the vested rights claim and granted it as to all other claims. The trial court consolidated the preliminary injunction hearing with a trial on the merits on the vested rights claim and entered judgment for Appellees, finding that Appellants had failed to establish "by a preponderance of the evidence that they acquired vested rights in *any* of the nine projects." Appealed Order 2 at 13.[11] Appellants now challenge the trial court's rulings on the contract clause and vested rights claims. Additional facts will be provided below.

# Discussion and Decision

## Section 1 – Appellants failed to establish that the Moratorium impaired any of their contractual obligations.

[9] Appellants contend that the trial court erred in granting Appellees' motion to dismiss the contract clause claims for failure to state a claim upon which relief can be granted.[12] Such motions test the legal sufficiency of the claim, not the facts supporting it. *Kitchell v. Franklin*, 997 N.E.2d 1020, 1025 (Ind. 2013). Therefore, we review the trial court's ruling de novo. *Id.* We view the pleadings in the light most favorable to the nonmoving party, with every

---

[11] Appellants included copies of exhibits in their appendix in contravention of the appellate rules. *See* Ind. Appellate Rules 50(F) ("Because the Transcript is transmitted to the Court on Appeal pursuant to Rule 12(B), parties should not reproduce any portion of the Transcript in the Appendix.") and 2(K) (defining Transcript as "the transcript or transcripts of all or part of the proceedings in the trial court or Administrative Agency that any party has designated for inclusion in the Record on Appeal *and any exhibits associated therewith.*") (emphasis added).

[12] Appellants focus their arguments exclusively on Mainstreet Property Group and Mainstreet Realty and do not specifically address 7105 E SR 334's situation. As stated above, Mainstreet Realty was the only Mainstreet entity that was a party to the contracts at issue.

reasonable inference construed in that party's favor. *Id.* "If a complaint states a set of facts that, even if true, would not support the relief requested, we will affirm the dismissal. And we may affirm the grant of a motion to dismiss if it is sustainable on any theory." *McPeek v. McCardle*, 888 N.E.2d 171, 174 (Ind. 2008) (citation omitted).

[10] Article I, Section 10 of the United States Constitution provides that no state shall pass any law impairing the obligations of contracts. Similarly, Article 1, Section 24 of the Indiana Constitution provides that no law impairing the obligation of contracts shall ever be passed. "[E]very statute stands before us clothed with the presumption of constitutionality until clearly overcome by a contrary showing." *Abernathy v. Gulden*, 46 N.E.3d 489, 493 (Ind. Ct. Ap. 2015). The party challenging the constitutionality of the statute bears the burden of making that showing, and all doubts are resolved against that party. *Id.*

[11] "It long has been established that the Contract Clause limits the power of the States to modify their own contracts as well as to regulate those between private parties." *U.S. Tr. Co. of New York v. New Jersey*, 431 U.S. 1, 17 (1977). "Yet the Contract Clause does not prohibit the States from repealing or amending statutes generally, or from enacting legislation with retroactive effects." *Id.* The first inquiry in addressing a contract clause claim is "whether, and to what extent, the state law operated as a substantial impairment of a contractual relationship …." *Clem v. Christole, Inc.*, 582 N.E.2d 780, 783 (Ind. 1991) (citing *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 245 (1978), in addressing

Indiana constitutional claim). Appellants' complaint is vague about the contractual obligations allegedly impaired by the Moratorium, asserting only that Mainstreet Realty was "prevented from continuing under the terms of [its] contracts because of [its] subsequent inability to develop the land under the Moratorium." Appellants' App. Vol. 2 at 53. But the Moratorium did not prevent Mainstreet Realty from buying the land or prevent the various landowners from selling it, which were the essential obligations of the contracts. Mainstreet Realty's contract with 7105 E SR 334 was the only contract attached to Appellants' complaint. There is no indication that the other contracts differ in any material respect. That contract allowed Mainstreet Realty to terminate the agreement and "immediately" receive its earnest money if it was satisfied that it would not be able to obtain governmental approval of its proposed development of the property for its intended use. *Id.* at 77. The trial court's order on Appellants' vested rights claim indicates that is exactly what happened. The contracts did not obligate the landowners to grant Mainstreet Realty a license to develop a comprehensive care health facility; that obligation, if any, lay with ISDH, which was not a party to the contracts. At most, then, the Moratorium may have implicated Indiana's vested rights doctrine, which we address below. Because Appellants have failed to show that the Moratorium impaired any of their contractual obligations, we affirm the trial court's dismissal of the contract clause claims and need not delve further into Appellants' argument.

## Section 2 – Appellants failed to establish that Mainstreet Property Group had vested rights in any of the projects.

[12]     Appellants also contend that the trial court erred in concluding that they failed to establish that they had any vested rights in the nine projects at issue.[13]  The record indicates that the trial court asked the parties to submit proposed orders on its own motion.  *See* Appellants' App. Vol. 2 at 10 (chronological case summary entry for Feb. 13, 2017).

> When a trial court has entered specific findings on its own motion, the specific findings control only as to the issues they cover, and the general judgment controls as to the issues upon which the court has not made findings.  The specific findings will not be set aside unless they are clearly erroneous and we will affirm the general judgment on any legal theory supported by the evidence.  A finding is clearly erroneous when there are no facts or inferences drawn therefrom which support it.  In reviewing the trial court's findings, we neither reweigh the evidence nor judge the credibility of the witnesses.

*Hanson v. Spolnik*, 685 N.E.2d 71, 76-77 (Ind. Ct. App. 1997) (citations omitted), *trans. denied*.  Rather, we consider only the evidence and reasonable inferences drawn therefrom that support the judgment.  *Id*. at 77.  To the extent the issues raised are questions of law, we review them de novo and owe no deference to the trial court's legal conclusions.  *Staggs v. Buxbaum*, 60 N.E.3d 238, 245 (Ind.

---

[13] As stated above, Appellants' complaint specifically alleged that the Moratorium violated Indiana's vested rights doctrine as to Mainstreet Property Group.  Appellants' App. Vol. 2 at 49.  The trial court's order and Appellants' briefs do not differentiate among the Mainstreet entities, and Appellants make no specific arguments regarding 7105 E SR 334.

Ct. App. 2016), *trans. denied*. "Where, as here, the party who had the burden of proof at trial appeals, he appeals from a negative judgment and will prevail only if he establishes that the judgment is contrary to law." *Fowler v. Perry*, 830 N.E.2d 97, 102 (Ind. Ct. App. 2005). "A judgment is contrary to law when the evidence is without conflict and all reasonable inferences to be drawn from the evidence lead to only one conclusion, but the trial court reached a different conclusion." *Id.*

[13] A relatively recent line of cases exploring the contours of Indiana's vested rights doctrine originates with our supreme court's opinion in *Metropolitan Development Commission of Marion County v. Pinnacle Media, LLC*, 836 N.E.2d 422 (Ind. 2005) ("*Pinnacle I*"), *clarified on reh'g*, 846 N.E.2d 654 (Ind. 2006) ("*Pinnacle II*"), *appeal after remand*, *Pinnacle Media, LLC v. Metropolitan Development Commission*, 868 N.E.2d 894 (Ind. Ct. App. 2007) ("*Pinnacle III*"), *trans. denied*. Pinnacle was informed by the City of Indianapolis that the City's zoning ordinance did not cover interstate highway rights-of-way. Pinnacle leased land in those rights-of-way, applied for and received permits from the Indiana Department of Transportation ("INDOT"), and erected two billboards without seeking approval from the City. The City subsequently amended the zoning ordinance to encompass the rights-of-way and stopped Pinnacle from erecting a third billboard. Pinnacle sought a declaration that the amendment was inapplicable to ten planned billboards for which INDOT permit applications were pending when the amendment was proposed and passed. The trial court entered summary judgment in Pinnacle's favor.

[14] On appeal, our supreme court observed that the question of whether the billboards were subject to the zoning ordinance amendment "implicate[d] two disparate lines of Indiana cases[,]" both of which

> employ the term "vested rights" and generally stand for the proposition that a person's "vested rights" are protected against retroactive application of a change in law. But each line takes a quite different approach to defining or determining when a "vested right" exists, and these approaches can lead to different results.

*Pinnacle I*, 836 N.E.2d at 425. The court noted that,

> [a]s a general proposition, the courts have been willing to hold that the developer acquires a "vested right" such that a new ordinance does not apply retroactively if, but only if, the developer "(1) relying in good faith, (2) upon some act or omission of the government, (3) … has made substantial changes or otherwise committed himself to his substantial disadvantage prior to a zoning change."

*Id*. at 425-26 (quoting John J. Delaney & Emily J. Vaias, *Recognizing Vested Development Rights as Protected Property in Fifth Amendment Due Process and Takings Claims*, 49 WASH. U.J. URB. & CONTEMP. L. 27, 31-35 (1996)).

[15] The court approved of a line of cases suggesting that "'there can be no vested rights' where 'no work has been commenced, or where only preliminary work has been done without going ahead with the construction of the proposed building ....'" *Id*. at 428 (quoting *Lutz v. New Albany City Plan Comm'n*, 230 Ind.

74, 81, 101 N.E.2d 187, 190 (1951)).[14]  The court then rejected a line of cases holding that merely filing a building permit "creates a vested right that cannot be overcome by a change in zoning law …."  *Id.* (overruling *Knutson v. State ex rel. Seberger*, 239 Ind. 656, 160 N.E.2d 200 (1959)).[15]  The court held that the zoning ordinance amendment was applicable to Pinnacle, noting that Pinnacle had not started construction before the amendment was proposed or enacted and did not receive the requisite INDOT permits to erect the billboards until after the amendment was enacted.  Consequently, the court reversed and remanded with instructions to enter summary judgment for the City.

[16]  Pinnacle petitioned for rehearing.  In response to the argument of Pinnacle's amici that "the 'mere filing' for a permit … invokes the expenditure of a tremendous amount of time, effort and money" and that a property owner "is at the whim of the legislative or administrative body until such time as he actually starts construction[,]" the court clarified that

> the focus is on whether or not vested rights exist, not whether some filing has been made with a government agency, a filing that might be purely ministerial and represent no material expenditure of money, time, or effort.  We acknowledge, as perhaps our original opinion should have, that vested rights may well accrue prior to the filing of certain applications.  (We saw no

---

[14] *Lutz* involved a nonconforming use, i.e., "a use of property that lawfully existed prior to the enactment of a zoning ordinance that continues after the ordinance's effective date even though it does not comply with the ordinance's restrictions."  *Pinnacle I*, 836 N.E.2d at 425.

[15] The *Knutson* line of cases "trace[d] its origin in Indiana law to zoning law but … over the years [was] invoked more generally when a person [had] an application for a government permit pending at the time a law governing the granting of the permit [changed]."  *Pinnacle I*, 836 N.E.2d at 426.

evidence of vested rights having accrued in the facts of this case and indeed it was Pinnacle's position that under Indiana law "mere application for a permit … grant[s] an applicant a vested right to have its application construed in accordance with existing law.") It is beyond the scope of this opinion, and unfair to future litigants, to respond to the hypothetical scenarios set forth in the amici brief, but we believe our original opinion establishes a basic framework for such analysis in future cases that will protect vested rights to the full extent the Constitution requires.

*Pinnacle II*, 846 N.E.2d at 656-57 (citation omitted).

[17] On remand, Pinnacle unsuccessfully sought to amend its complaint "to assert claims that it allege[d] did not exist prior to the Supreme Court's decision in *Pinnacle I*." *Pinnacle III*, 868 N.E.2d at 899. On appeal, Pinnacle argued that its amended complaint would "assert exceptions to the 'new rule that an applicant for a building permit does not obtain a vested right unless and until construction is commenced.'" *Id*. at 900 (citation omitted). Another panel of this Court opined that Pinnacle

> misconstrues the holding in *Pinnacle I*. There is no bright-line rule that construction must have commenced in order to show a vested right.… [In *Pinnacle II*, our] Supreme Court reiterated that the existence of a vested right is fact-dependent, and the court noted that there is no evidence in the record to show a vested right in this case.

*Id*. The court affirmed the denial of Pinnacle's motion to amend on res judicata grounds, holding that

the issues Pinnacle asserts in its proposed amended complaint seeking to establish that it had a vested right were, or could have been, determined in the original action. Our Supreme Court's opinion in *Lutz* and its progeny have been in existence for more than fifty years. Pinnacle opted to rely on *Knutson*, but Pinnacle could have also made arguments based on *Lutz*. Pinnacle might well have presented evidence other than the permit application to show a vested right.

*Id*. In a footnote to that paragraph, the court stated, "Expenses incurred before a permit application may typically include the costs associated with leases, options, and land purchases, as well as surveying, engineering, site planning, and rezoning." *Id*. at n.1.

[18] The *Pinnacle* cases resurfaced in *City of New Haven v. Flying J, Inc.*, 912 N.E.2d 420 (Ind. Ct. App. 2009), *trans. denied*. Flying J owned over seventeen acres of land in New Haven that it wanted to develop into a travel plaza with a service station. Flying J ultimately prevailed in litigation with the City's board of zoning appeals ("BZA") regarding whether its proposed uses for the land were permitted by the City's zoning ordinance. During the litigation, the City amended the ordinance to restrict service stations to a maximum of two acres. Unaware of the amendment, Flying J submitted its development plan to the BZA, and the zoning director rejected it based on the amended ordinance. The BZA affirmed that decision, but the trial court ruled in Flying J's favor.

[19] On appeal, another panel of this Court addressed "whether the amended zoning ordinance is applicable to Flying J's planned travel plaza" by analyzing the *Pinnacle* opinions. *Id*. at 424. The BZA argued that "because Flying J had not

yet begun construction on its travel plaza, Flying J had no vested right to develop the travel plaza pursuant to the original zoning ordinance." *Id*. at 425. The court replied, "If *Pinnacle I* were the only case we considered, we might well agree with the BZA that Flying J had no vested right because it had not yet begun construction on the travel plaza." *Id*. In light of the subsequent decisions, however, the court

> read the *Pinnacle* cases to mean that, while construction definitely does establish a vested right, mere preliminary work, including filing of a building permit, does not. In situations falling between these two extremes, courts must engage in a fact-sensitive analysis to determine whether vested rights have accrued prior to application for a building permit or construction.

*Id*. at 426.

[20] Focusing on the aforementioned footnote in *Pinnacle III*, Flying J noted that it had spent over $4,000,000 "prior to the commencement of construction[,]" including over $3,700,000 to purchase the property, over $194,000 in legal fees, over $45,000 for engineering and surveying, and over $8600 in travel expenses. *Id*. The BZA challenged many of the expenditures, "especially the real estate purchase price, legal fees, and travel expenses, claiming that such are preliminary expenses inadequate to establish a vested right." *Id*. The court replied,

> [E]ven were we to agree with the BZA's argument regarding these particular expenses, Flying J's other proved expenses, including tens of thousands of dollars on engineering and surveying, constitute more than mere "preliminary" work or

expenses akin to merely applying for a building permit. Rather, these are the sort of expenses we referred to in *Pinnacle III* when we listed expenses that could give rise to a vested right. This is especially so in light of the status of the continuing litigation between the parties when the BZA amended the zoning ordinance at issue.

*Id*. at 426-27 (citation to *Pinnacle III* omitted). In light of the fact-sensitive nature of a vested rights determination, the court gave deference to the trial court's findings and affirmed its ruling that "the amendments to the zoning ordinances were subject to Flying J's vested right in the property and that the amended zoning ordinance was not applicable to Flying J's planned travel plaza." *Id*. at 427.

[21] This case differs from the *Pinnacle* and *Flying J* cases in two obvious respects. One, we are concerned here with a statute prohibiting state licensure of health care facilities, rather than a zoning ordinance terminating a nonconforming use; neither side argues that different or additional considerations should apply in our vested rights analysis, and we can think of none. Two, unlike the aggrieved parties in the *Pinnacle* and *Flying J* cases (and the relevant cases cited therein), neither Mainstreet Realty nor Mainstreet Property Group had a possessory interest in the properties when the Moratorium became effective.

[22] Appellants argue that "[n]othing in *Pinnacle* or its progeny … stands for the proposition that a separate possessory interest sufficient to support a takings challenge is a prerequisite of vested rights." Appellants' Reply Br. at 29. Appellants quote from the law review article cited in *Pinnacle I* to press their

point, without acknowledging that the article's stated purpose is to "demonstrate that a *landowner* possessing vested development rights under state law has a property interest and reasonable expectations which are entitled to great weight when determining the viability of the *landowner's* Fifth Amendment takings claim or substantive due process claim." Delaney & Vaias at 28 (emphases added) (footnote omitted); *see also id*. at 31 ("Generally, the black-letter rule for acquisition of vested rights provides that a *landowner* will be protected when: (1) relying in good faith, (2) upon some act or omission of the government, (3) he has made substantial changes or otherwise committed himself to his substantial disadvantage prior to a zoning change.") (emphasis added). Appellants also disregard the *Pinnacle I* court's mention of the constitutional due process and takings clauses. *See* 836 N.E.2d at 425 ("In [situations involving a nonconforming use], it is often said that the *landowner* had a 'vested right' in the use of the property before the use became nonconforming, and because the right was vested, the government could not terminate it without implicating the Due Process or Takings Clauses of the Fifth Amendment of the federal constitution, applicable to the states through the Fourteenth Amendment.") (emphasis added).

[23] To be sure, isolated phrases in the *Pinnacle* and *Flying J* cases could be read to suggest that a party with no possessory interest in property may nevertheless acquire vested rights in its use or development by expending sufficient money, time, or effort. *See Pinnacle II*, 846 N.E.2d at 656 ("We acknowledge, as perhaps our original opinion should have, that vested rights may well accrue

prior to the filing of certain applications."); *Pinnacle III*, 868 N.E.2d at 900 n.1 ("Expenses incurred before a permit application may typically include the costs associated with leases, options, and land purchases …."); *Flying J*, 912 N.E.2d at 426 (agreeing for argument's sake with BZA's claim that real estate purchase expense is inadequate to establish a vested right). But we could find no Indiana case that specifically holds this, and Appellants have cited no cases from any jurisdiction for this proposition. Without definitive guidance from our supreme court, however, we decline to adopt a bright-line rule that a possessory interest in property is a prerequisite for acquiring vested rights to use or develop that property in a particular manner. At the very least, a possessory interest should be a significant factor in determining whether vested rights exist; the absence of a possessory interest may not necessarily be dispositive, but it would certainly militate toward a finding of no vested rights.

[24] With the foregoing in mind, we consider the vested rights issue as addressed in the trial court's judgment. The trial court referred to Mainstreet's five-stage development process and found that most of the work in the market analysis and site selection phases (which had been reached in all nine projects) had been performed by Mainstreet entities. The court found that Mainstreet had submitted construction design plans to ISDH for five of the projects but had not begun construction on any of the projects. The court also found that only "[f]our projects had executed land contracts in place." Appealed Order 2 at 4. Furthermore, the court found that Mainstreet had not established that it had lost any earnest money, that Mainstreet received no funds pursuant to any

financing agreement, and that the legal expenses associated with canceling such agreements were incurred in-house.

[25] The trial court made the following specific findings regarding Mainstreet's alleged expenditures for certain projects and its reliance on governmental acts:

> 34. Mainstreet contends that it spent $52,000 for each of the Evansville, Muncie and Gary projects.[16] However, these alleged expenditures are for "internal time, resources, expenditures, and the development fee…." The "development fee" is purportedly an "internal fee" paid by Mainstreet Property to Mainstreet Asset Management.
>
> 35. Mainstreet did not have the land parcel selected for the Evansville project. No letter of intent was ever issued.
>
> 36. No letter of intent was ever issued with respect to the Gary project. Plaintiffs did not obtain any financing with respect to the Gary project.
>
> 37. Mainstreet did not have the land parcel selected for the Muncie project. No letter of intent was ever drafted. Mainstreet did not obtain any financing with respect to the Muncie project.
>
> 38. Any "financing fee" listed on Exhibit 10 is paid by Mainstreet Property to Mainstreet Asset Management, which are under common control.
>
> 39. Mainstreet relies on Exhibit 10 to show the substantial outlay [of] resources on developing these projects prior to the Moratorium going into effect. Exhibit 10 shows that Mainstreet

---

[16] This figure comes from the deposition testimony of Mainstreet Asset Management Vice President of Development Douglas Pedersen, which was admitted as an exhibit at trial.

incurred and committed millions of dollars for each of the nine projects. The Exhibit shows the following total "expenditure" by Mainstreet for each project:

a. Zionsville ---- $1,670,415
b. Fort Wayne ---- $1,645,018
c. Hobart ---- $1,693,435
d. New Haven ---- $1,623,874
e. Warsaw ---- $1,535,448
f. Jeffersonville ---- $1,243,677

40. However, those "commitments" listed in Exhibit 10 have not been paid by the Plaintiffs.[17]

41. The "cost of preferred equity" listed in Exhibit 10 has been identified by Plaintiffs as "cost of equity investment return" rather than an outlay of funds.[18]

42. Plaintiffs have not presented evidence of exactly how much was paid for the projects listed on Exhibit 10. This is a substantial void in the evidence. It appears that Mainstreet intended to confound the actual expenditure of funds to external service providers with funds that Mainstreet simply transfers back-and-forth between its own entities.

43. When looking at the only column in Exhibit 10 that appears

---

[17] Pedersen testified that commitments are the balance of unpaid contractual obligations to third parties. Ex. Vol. 3 at 106. For example, Exhibit 10 shows that Mainstreet Property Group incurred $822,385 in third-party costs for the Zionsville project and had commitments totaling $330,578. Pedersen testified that he did not know whether "any third parties [were] demanding that the commitments be paid with respect to the Zionsville property[.]" *Id.* at 108.

[18] Pedersen testified that the cost of equity investment return is "estimated off 18 months of interest on the equity from committed equity investors" and that Mainstreet Property Group was "still obligated to pay the equity investors" despite that "construction never occurred with respect to the six properties listed" in finding 39. Ex. Vol. 3 at 148. According to Exhibit 10, the total cost of preferred equity for the six projects is $2,850,608. *Id.* at 238.

to show an actual expenditure of funds to external service providers, it appears that, at best, Mainstreet has only actually expended about 10% of what it claims it has incurred and committed.

….

56. …. In the instant case, Plaintiffs had no property interest in any of the sites related to the projects and performed no material improvements or actions on the property.[19]

57. Additionally, this court does not believe Plaintiffs cannot [sic] use "internal" costs, which are merely transfers under the "Mainstreet umbrella" to attempt to show the Court that they made material expenditures of money with respect to the projects.

58. Moreover, any claim of a vested right must surmount the requirement that the developer relied in good faith on some action of the government.

59. No action by the legislature created any such good faith reliance in this case. As a matter of fact, the Legislature had shown its intention a year earlier to create a moratorium on the development of health care facilities. The Moratorium had been proposed in 2014 and 2015, and Plaintiffs knew that the Moratorium bill was going through the legislature. While the Moratorium bill did not pass in 2014, it did pass in 2015. Mainstreet's decision to push forward with additional projects while the Legislature was in the middle of deciding whether to prevent such projects is a business risk. There is nothing wrong with a business taking a risk; businesses should do that.

---

[19] We reject Appellants' assertion that this conclusion "necessarily suggests that the trial court thinks that construction must occur at the site for vested rights to accrue." Appellants' Br. at 62.

However, when the risk does not pan out, they cannot then say they relied in "good faith" on the current status of the law.

60. Providing comprehensive care services is a heavily regulated industry in which the participants are typically aware of proposed changes in the law before they occur.

61. For two consecutive years, the proposed moratorium had been the subject of extensive debate within the comprehensive care industry and by the legislature, and Mainstreet even "spoke on the bill itself."

62. The Court believes that the issue of "good faith reliance" is a legal hurdle that Mainstreet cannot clear. In all the cases cited to the court regarding vested rights, such as the *Pinnacle* line, *Knutson*, *Lutz*, and *Flying J*, the one element that is different is that the developers had no reason to suspect the development of their project, whether it be billboards, a neighborhood, a gas station, or a fueling center, would be denied.

....

67. Along with the court's determination that the Plaintiffs have not met their burden regarding proving *good faith reliance*, the Court also believes that the facts do not show that Plaintiffs have made substantial changes or otherwise committed themselves to a substantial disadvantage prior to a zoning change.

68. Based on the foregoing, Plaintiffs have not met their burden by a preponderance of the evidence that they acquired vested rights in *any* of the nine projects.

*Id.* at 6-13 (record citations omitted).

Appellants first contend that the trial court misconstrued good faith reliance. According to Appellants,

> [r]elying in good faith means that a developer believes that the current state of the law permits the development and that the developer pursues the project on that belief. So in this case, good faith reliance would mean that at the time Mainstreet started and pursued a project, it believed that the current state of the law permitted them to complete that project. This, of course, was the case here.

Appellants' Br. at 52-53. Appellants argue that "Mainstreet expects the industry to be regulated, but it does not expect the industry to be regulated retroactively." *Id.* at 54. They claim that, "[u]nder the trial court's holding, Mainstreet should have immediately ceased all activity in the State of Indiana in 2014. But if businesses had to cease activity every time there was a proposed law or possible change, economic activity would come to a standstill." *Id.* at 55.

Appellants' argument on this point is well taken. The proposed moratorium in Senate Bill 173 put Mainstreet on notice that the legislature was giving serious thought to capping the number of comprehensive care health facilities at the end of June 2014, six months after the bill was introduced. But once that bill failed to become law, it would have been unreasonable to expect Mainstreet to shelve its existing projects or avoid starting new projects until the next

legislative session[20] on the off chance that a similar moratorium would be proposed and successfully enacted. As it turned out, the Moratorium in Senate Bill 460 was significantly and unexpectedly different because it was retroactive at its inception on March 9, 2015, and therefore did not give Mainstreet (or anyone else) an opportunity to submit construction design plans for projects that were already in the pipeline. We agree with Appellants that businesses should "not be forced to anticipate an unforeseen subsequent change in the law." Appellants' Reply Br. at 31. Consequently, we disagree with the trial court's conclusion that Mainstreet failed to establish that it relied in good faith on existing law.

[28] Next, Appellants assert that the trial court erred in finding that they had not "presented evidence of exactly how much was paid for the [six] projects listed on Exhibit 10." Appealed Order 2 at 7.[21] They claim that the "expenditures include the exact items that were sufficient for rights to vest in *City of New Haven*, including, inter alia, surveying, geotechnical investigations, civil engineering services, structural engineering services, schematic designing." Appellants' Br. at 59. Unlike the detailed evidence presented by Flying J in *City of New Haven*, *see* 912 N.E.2d at 426 (list of thirteen separate costs), neither Exhibit 10 nor the supporting deposition testimony of Mainstreet Asset Management Vice President of Development Douglas Pedersen provided

---

[20] We note that 2014 was an election year.

[21] Pedersen testified that the expenditures for the Gary, Evansville, and Muncie projects were purely internal.

specifics regarding how much money was spent on each project for any of those items. Moreover, there was no evidence that Mainstreet would have to pay any of the almost $2,000,000 in outstanding contractual commitments to third parties, and the stated cost of preferred equity for each project did not include a breakdown of the investors' principal (which did not come out of Mainstreet's pocket) and the return on investment (if any).

[29] Appellants also complain that the trial court erred "when it failed to consider the significant expenditures of money, time, and effort, made by Mainstreet itself." *Id.* at 60.[22] Pedersen testified generally about the stages of Mainstreet's development process, but Appellants provided no detailed evidentiary basis (such as actual time spent or hourly rates) for the development and financing fees that were charged from one Mainstreet entity to another. We may not second-guess the trial court's apparent belief that those fees were more of an accounting stratagem than an indication of actual expenditures of money, time, and effort. Moreover, Appellees point out that the foregoing precedent "[does] not say that internal costs may be considered in determining whether a developer's expenses are of such an extent that it has a vested right in a project." Appellees' Br. at 53-54.

_____

[22] Appellants claim that "[t]he total combined internal expenditures for all of Mainstreet's pending projects was $3,946,368." Appellants' Reply Br. at 9 (citing Appellants' App. Vol. 3 at 187, 192, 195, 241-42). That total appears to be based on the development and financing fees for the six projects listed in Exhibit 10 and Pedersen's testimony regarding the expenditures for the Gary, Evansville, and Muncie projects.

[30] In sum, Appellants' evidence regarding the expenditure of money, time, and effort could be characterized as normal business efforts expended to investigate future business opportunities. "[T]he existence of a vested right is fact-dependent[,]" *Pinnacle III*, 868 N.E.2d at 900, and we must defer to the trial court's factual findings on this issue. With respect to the Hobart, Warsaw, Gary, Evansville, and Muncie projects, Mainstreet Realty did not have a contractual interest, let alone a possessory interest, in any property. In light of all this, we cannot say that the trial court erred in finding that no vested right existed as to these projects.

[31] The Zionsville, Jeffersonville, Fort Wayne, and New Haven projects present a closer call, in that they were further along in the development process, and Mainstreet Realty had executed land purchase agreements. But Mainstreet Realty had not acquired a possessory interest in the target properties,[23] and the evidence regarding the expenditure of money, time, and effort on those projects could, as above, be characterized as the exploration of future business opportunities. Any commercial development project involves an element of financial risk, and we agree with the trial court's assessment that "the facts do not show that [Appellants] have made substantial changes or otherwise committed themselves to a substantial disadvantage" so as to create a vested right. Appealed Order 2 at 12-13. Therefore, we affirm the trial court's judgment for Appellees on Appellants' vested rights claim.

---

[23] As mentioned earlier, all earnest money for these contracts was returned to Mainstreet Realty.

Affirmed.

Robb, J., and Bradford, J., concur.