

FILED

Sep 07 2023, 8:43 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jason M. Kuchmay
Snyder Morgan Federoff & Kuchmay, LLP
Syracuse, Indiana

ATTORNEYS FOR APPELLEE
STARKE SOLAR, LLC D/B/A
MAMMOTH SOLAR

Rachel S. Bir
Kaylin O. Cook
Christopher D. Shelmon
Gutwein Law
Lafayette, Indiana

ATTORNEYS FOR APPELLEE
PULASKI COUNTY COUNCIL

Mark J. Crandley
Barnes & Thornburg LLP
Indianapolis, Indiana

Kevin C. Tankersley
Winamac, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Connie Ehrlich, et al.,

*Appellants-Petitioners,*

v.

Starke Solar, LLC d/b/a
Mammoth Solar, and the Pulaski
County Council,

*Appellees-Respondents*

September 7, 2023

Court of Appeals Case No.
22A-PL-1738

Appeal from the Pulaski Superior Court

The Honorable Richard R. Stalbrink, Jr., Special Judge

Trial Court Cause No. 66D01-2201-PL-1

**Opinion by Judge May**
Judges Crone and Weissmann concur.

**May, Judge.**

[1]     Connie Ehrlich, et al. (collectively "Remonstrators") appeal the trial court's order upholding a designation by the Pulaski County Council ("the Council") of approximately 9,205 acres in Pulaski County ("the Property") as an Economic Revitalization Area ("ERA") and the approval of a tax abatement for that Property. Starke Solar, LLC d/b/a Mammoth Solar ("Mammoth") plans to develop a commercial solar-power facility ("Solar Project") on the Property. Remonstrators raise multiple issues, which we consolidate and restate as whether, as a matter of law, farmland on which drainage tiling and irrigation systems have been installed qualifies as land that has been "developed" and "improved" for purposes of the statutory definition of an ERA. On cross-appeal, Mammoth and the Council (collectively "Appellees") assert Remonstrators lack standing to appeal the Council's decision. Because Remonstrators have standing but their legal arguments fail, we affirm.

## Facts and Procedural History

[2]     In order to develop the Solar Project, Mammoth sought a tax abatement by having the Property designated an ERA. Remonstrators are landowners in Pulaski County. On August 9, 2021, the Council held a public meeting to consider Mammoth's request. At that meeting the Council passed and adopted Pulaski County Resolution No. 2021-09 (the "Preliminary Resolution")

establishing the Property as an ERA for a period of 40 years. (Appellants' App. Vol. II at 39.) In conjunction with the Preliminary Resolution, maps and plats were provided that identified the Property. The Council set October 25, 2021, as the date for a public hearing for receiving remonstrations and objections from interested persons prior to adopting a final resolution on the ERA, but that public hearing was moved to December 13, 2021, due to the amount of information to consider.

[3] The Council appointed a steering committee to review all the relevant information and to make recommendations to the Council. Remonstrators submitted written objections and written remonstrances prior to the hearing on December 13, 2021, and Remonstrators also received draft copies of reports that Mammoth had provided regarding the impact of the Solar Project on Pulaski County. The public hearing was held on December 13, 2021, with Remonstrators appearing individually and by counsel. Time was given for public comment, and then the Council continued the public meeting until January 10, 2022, so that it had time to review and consider the evidence presented. The Council invited individuals to submit additional written commentary and evidence regarding the ERA designation and proposed tax abatement. In response thereto, Remonstrators presented Supplemental Objections.

[4] On January 10, 2022, the Council held the continued public meeting. At that meeting, the Council confirmed the Preliminary Resolution, designated the Property an ERA, and approved the tax abatement. The "Confirmatory

Resolution" – "Pulaski County Resolution No. 2021-15/2022-01" – states, in necessary part:

1. the [Property] is within the County and the [Property] has become undesirable for, or impossible of, normal development and occupancy because of a lack of development, cessation of growth, deterioration of improvements or character of occupancy, age, obsolescence, substandard buildings, or other factors which have impaired values and prevented a normal development of property and use of property;

2. the [Property], described in Exhibit A and located at locations within Pulaski County described by the maps included as Exhibit B, are designated an Economic Revitalization Area for a period of 40 years commencing this day, confirming the prior resolution;

3. this Economic Revitalization Area allows abatement of property taxes attributable to redevelopment or rehabilitation activities and the installation of new manufacturing equipment, all as defined in I.C. 6-1.1-12.1-1 and permitted under I.C. 6-101-121-3 and I.C. 6-1.1-12-4.5;

4. such redevelopment or rehabilitation activities and such manufacturing equipment as described in part 3, above, are limited strictly to investments made for the purpose of generating electricity from solar energy for the public grid and to activities and equipment in direct support of such efforts, or to other purposes related thereto and fully compliant with the Pulaski County Unified Development Ordinance, as amended, and any actions taken by the Pulaski County Advisory Plan Commission or Pulaski County Board of Zoning Appeals in their efforts to enforce and interpret aforesaid ordinance;

5. based on the information in the Statement of Benefits describing the Project:

> (a) the estimate of the cost of the Equipment is reasonable for equipment of that type;
>
> (b) the estimate of the number of individuals who will be employed or whose employment will be retained can be reasonably expected to result from the installation of the Equipment;
>
> (c) the estimate of the annual salaries of those individuals who will be employed or whose employment will be retained can be reasonably expected to result from the installation of the Equipment;
>
> (d) the other benefits about which information was requested are benefits that can be reasonably expected to result from the proposed installation of the Equipment;
>
> (e) the totality of benefits is sufficient to justify the granting of personal property tax deductions to the Applicant pursuant to IC 6-1.1-12-4.5;

> * * * * *

8. having made its findings in the affirmative, the Council approves the aforesaid tax abatement and confirms the Preliminary Resolution[.]

(*Id.* at 69-70.)

On January 20, 2022, Remonstrators filed a petition for judicial review in the Pulaski Superior Court to challenge the Confirmatory Resolution. The petition for review alleged "the adoption of the Confirmatory Resolution is: (i) contrary to economic revitalization area law; (ii) arbitrary and capricious; (iii) unsupported by the evidence; (iv) in violation of the Petitioners' Due Process rights; and (v) otherwise contrary to Indiana law." (*Id.* at 37.) On April 1, 2022, Mammoth filed a motion for judgment on the pleadings challenging Remonstrators' standing to bring the judicial review action based on Mammoth's assertion that Remonstrators were not aggrieved by the Council's decision. The trial court heard argument on April 25, 2022. None of the parties submitted additional evidence as permitted by Indiana Code section 6-1.1-12.1-2.5(e). Remonstrators argued the question before the court – whether farmland could qualify as an ERA – was a question of law, rather than facts. On June 30, 2022, the trial court issued an order confirming the Council's designation of the Property as an ERA and approval of a tax abatement.[1] The trial court's order included the following conclusions of law:

> 17. Creation of an ERA is a discretionary tool that allows the County Council to designate an area for economic revitalization. IC 6-1.1-12.1-1.

> 18. Once the ERA is established, taxpayers in the ERA may apply for a property tax abatement.

---

[1] The trial court's order did not address Remonstrators' standing to appeal the Confirmatory Resolution.

19. The County Council began this process by establishing an ERA in Preliminary Resolution No. 2021-09 wherein they designated approximately 9,205.33 acres owned by several different owners, none of whom are petitioners in this matter.

20. On December 13, 2021, and January 10, 2022, public hearings were held wherein the County Council reviewed evidence submitted by the remonstrators and by Mammoth. Ultimately, the decision was made to allow the designation of the ERA and allow the tax abatements.

21. The Petitioners first argue that the ERA set by the County does not qualify under the standards for an "economic revitalization area" as defined by Ind. Code § 6-1.1-12.1-1(1). The County Council was required to weigh the facts and apply them to the governing standard. A territory can be designated as an ERA if it is:

> an area which is within the corporate limits of a city, town, or county which has become undesirable for, or impossible of, normal development and occupancy because of a lack of development, cessation of growth, deterioration of improvements or character of occupancy, age, obsolescence, substandard buildings, or other factors which have impaired values or prevent a normal development of property or use of property.

Ind. Code § 6-1.1-12.1-1(1). The County Council determined that the ERA territory satisfies this definition because of "lack of development" or "cessation of growth" where there is no development occurring in the ERA territory. *Id.*

22. The words "development" and "growth" must be given their "plain meaning" and the Court must "consider the structure of

the statute as a whole." *Abbott v. State*, 183 N.E.3d 1074 (Ind. 2022).

23. There are no structures or other improvements on the parcels in the ERA. By contrast, "development" of property typically means adding improvements such as buildings or other structures. For instance, Black's Law Dictionary defines "development" as "a substantial human-created change to improved or unimproved real estate, including the construction of buildings or other structures." *Development*, BLACK'S LAW DICTIONARY (11th ed. 2019).

24. The General Assembly uses the term "development" to mean the same thing. Just four subsections after the provision defining an ERA, the General Assembly defined "redevelopment" to mean "the construction of new structures, in economic revitalization areas, either: (A) on unimproved real estate; or (B) on real estate upon which a prior existing structure is demolished to allow for a new construction." Ind. Code § 6-1.1-12.1-1.

25. The term "development" is used elsewhere throughout the Indiana Code to work hand-in-hand with "improvements" to property. *See also* Ind. Code § 36-7-4-1303 ("As used in this series, "development" means an improvement of any kind on land."); Ind. Code § 6-3.6-2-8.

26. The County Council was within its discretion to determine that the ERA did not include these types of improvements or otherwise showed any "growth" or "development." The property is unimproved, undeveloped farmland with no opportunities for growth or development outside the [S]olar [P]roject.

27. The language defining an ERA does not exempt land that is currently being farmed from its scope. The ERA statutes apply

when there is no "development" or "growth," even if the property is being farmed. Ind. Code § 6-1.1-12.1-1(1).

28. The General Assembly left it to local elected bodies to determine where development is needed. If the General Assembly intended to limit these ERAs on farmland, it would have said so. *Orange v. Indiana Bureau of Motor Vehicles*, 92 N.E.3d 1152, 1155 (Ind. Ct. App. 2018). The Petitioners cannot read that limitation into the statute when there is no language to support that reading. *Id.* ("[I]t is just as important to recognize what a statute does not say as it is to recognize what it does say.") (quoting *Rush v. Elkhart Cty. Plan Comm'n*, 698 N.E.2d 1211, 1215 (Ind. Ct. App. 1998)). The Petitioners may not "engraft new words" or create new restrictions under the guise of statutory construction. *Kitchell v. Franklin*, 997 N.E.2d 1020, 1026 (Ind. 2013).

29. The General Assembly recently amended Indiana Code § 6-1.1-12.1-1, effective July 1, 2022, to add language allowing ERAs to include "an area of land classified as agricultural land for property tax purposes that, as a condition of being designated an economic revitalization area, will be predominately used for agricultural purposes for a period specified by the designating body." See P.L. 8-2022 (S.E.A. 119).

30. The Court notes the General Assembly's recent amendment to Indiana Code § 6-1.1-12.1-1 to the extent that it provides context and insight into the legislative intent behind the already existing general definition of an ERA.

31. The amendment specifies that land that will continue to be used for agricultural purposes can be designated as an ERA. This language does not in any way suggest that the existing language of Ind. Code § 6-1.1-12.1-1 excluded farm property

from being designated as an ERA for purposes of improvements and other development.

32. While the amendments are instructive as to the legislative intent to include agricultural land, the Court applies the language as it currently exists.

33. In any event, the statute allows an ERA when there is "obsolescence" or "other factors" warranting the designation. Ind. Code § 6-1.1-12.1-1(1). The [S]olar [P]roject is located near where NIPSCO has installed high tension lines, making the area uniquely situated to easily provide energy to the grid. This unique feature creates an opportunity that renders the use of the property "obsolete" for farming.

34. The Council's determination that the real estate is an ERA is supported by substantial evidence in the record. It is unimproved, underdeveloped, and limited solely to agricultural use which has caused a cessation of growth.

35. Because Council's determination is supported by substantial evidence, the Council's determination is not arbitrary and capricious. *See*, *City of Indianapolis v. Woods*, 703 N.E.2d 1087, 1093 (Ind. Ct. App. 1998).

(Appellants' App. at 26-29) (formatting in original).

# Discussion and Decision

## 1. Standing

Appellees' challenge to Remonstrators' standing to appeal from the Council's ruling is a "threshold issue[,]" which we must address first. *Solarize Indiana, Inc.*

*v. S. Ind. Gas & Elect. Co.*, 182 N.E.3d 212, 216 (Ind. 2022). To be entitled to have a court decide a legal dispute, "a plaintiff must be a 'proper person' to invoke the court's authority." *Id.* (quoting *Horner v. Curry*, 125 N.E.3d 584, 589 (Ind. 2019)). Standing may be conferred by statute or by common law, *id.*, and when the legislature has provided a standing requirement for review of specific forms of government action, that is the requirement that we apply. *Id.* at 217. Regardless of the alleged basis for standing, if "plaintiffs allege no injury, there is no justiciable dispute." *City of Gary v. Nicholson*, 190 N.E.3d 349, 351 (Ind. 2022). We review questions of standing de novo. *Mammoth Solar v. Ehrlich*, 196 N.E.3d 221, 236 (Ind. Ct. App. 2022).

[7] Regarding the appeal of a decision about an ERA, our legislature provided: "A person who filed a written remonstrance with the designated body under this section and who is aggrieved by the final action taken may . . . initiate an appeal of that action . . . ." Ind. Code § 6-1.1-12.1-2.5(d). The Remonstrators filed written remonstrances with the Council. Appellees allege, however, that Remonstrators were not "aggrieved" by the Council's decision.

> To be aggrieved, the petitioner must experience a substantial grievance, a denial of some personal or property right or the imposition . . . of a burden or obligation. The . . . decision must infringe upon a legal right of the petitioner that will be enlarged or diminished by the result of the appeal and the petitioner's resulting injury must be pecuniary in nature. A [petitioner] must show some special injury other than that sustained by the community as a whole.

*Bagnall v. Town of Beverly Shores*, 726 N.E.2d 782, 786 (Ind. 2000) (internal citation and quotation marks omitted).

[8] Remonstrators note Mammoth challenged their standing when Remonstrators previously appealed the decision of the Pulaski County Board of Zoning Appeals ("BZA") granting a special exception for Mammoth to build the same Solar Project at issue herein. *See Mammoth Solar*, 196 N.E.3d 221. Therein, we held Remonstrators had standing to challenge the BZA's decision because their "evidence that they would suffer a pecuniary loss was sufficient to show that they were aggrieved." *Id*. at 237. That evidence included the following:

> Pulaski County real estate agent Stevenson submitted to the BZA a written report, wherein Stevenson concluded that the property values of rural homes, recreational land, and farmland would all decrease if the [Commercial Solar Energy Systems] were to be constructed. In addition, real estate broker Spooner, who conducted six months of research on the impact of a proposed solar farm in Madison County, submitted a report wherein she concluded that houses surrounded by a solar farm on three or four sides would be worthless, houses affected on two sides would suffer a 40% decrease in value, houses within one mile of a solar farm would suffer a 10% to 40% decrease in value, and houses within three miles of a solar farm would suffer a 10% to 20% loss. Indeed, even the BZA's decision specifically concluded that it was "undeniable and unavoidable" that a significant number of the 220 homes within one mile of the proposed site would see a decrease in property values.

*Id*. Remonstrators assert "[t]he standard in this case is the same, and the result should be the same here as well." (Appellants' Reply Br. (hereinafter "Reply Br.") at 9.)

Appellees argue that, while the "aggrieved" standard is the same, the decision being appealed – and thus the injury that needed to be demonstrated by Remonstrators – is not the same. The Council argues Remonstrators did not demonstrate they were aggrieved by "the grant of a tax abatement to their neighbors' property[.]" (Council Br. at 13.) According to Appellees, this was the particular injury that Remonstrators needed to demonstrate to have standing to appeal the ERA decision. In support, Mammoth points to our Indiana Supreme Court's decision last year in *Solarize Indiana, Inc. v. Southern Indiana Gas and Electric Co.*, 182 N.E.3d 212 (2022).

In *Solarize*, the Court was determining whether Solarize had standing to appeal a ruling by the Indiana Utility Regulatory Commission. The Court noted standing to appeal such rulings was created by statute and gave standing to parties who were "adversely affected by any final decision, ruling, or order of the commission[.]" Ind. Code § 8-1-3-1. The Court reiterated that demonstration of being "adversely affected" required a party to show three elements: "(1) it must have a personal (rather than general) interest in the outcome; (2) it must have suffered or be in immediate danger of suffering an injury; and (3) the injury must be a direct result of the final decision, ruling, or order." *Solarize*, 182 N.E.3d at 218-19. The Court noted a "'direct injury' is '[a]n injury resulting directly from a particular cause, without any intervening causes.'" *Id*. at 220 (quoting *Black's Law Dictionary* (11th ed. 2019)). The Court then held Solarize did not have standing to appeal the Commission's decision because the injury Solarize alleged – fewer customers entering the solar market,

which will decrease Solarize's funding – "would be the indirect result of intervening causes—market forces—on its potential customers and suppliers." *Id*. at 220.

[11] Mammoth argues:

> Petitioner-[Remonstrators] failed to present any argument as to how they could plausibly suffer an injury as a direct result of the County Council's determination designating the [Property] as an ERA. In fact, all of Petitioner-[Remonstrators]' "grievances" are a result of the Solar Project itself, raised only in other litigation in which most Petitioner-[Remonstrators] are parties, which is irrelevant for Petitioner-[Remonstrators]' standing to challenge the County Council's Confirmatory Resolution designating the [Property] as an ERA.

(Mammoth Br. at 26-27.)

[12] Appellees are correct that the available evidence suggests the Remonstrators will not sustain pecuniary injury from the tax abatement itself, as the abatement is predicted to decrease property taxes for taxpayers in Pulaski County. (Mammoth App. Vol. II at 34-35.) Nor can the Remonstrators rely on their arguments that "there would be a loss of jobs and income in the county" (Reply Br. at 9), and "the price at which Remonstrators could rent or acquire farmland in the County would be negatively impacted,"[2] (*id*.), as those injuries will be

---

[2] Remonstrators also allege "[t]hey suffered due process violations in the manner in which the tax abatement hearings were conducted[.]" (Reply Br. at 9.) However, as the alleged due process violations occurred *before* the entry of the Confirmatory Resolution, those alleged violations did not *result from* the Council's adoption of the Confirmatory Resolution.

borne by the community generally. *See*, *e.g.*, *Pflugh v. Indianapolis Historic Preservation Comm'n*, 108 N.E.3d 904, 910 (Ind. Ct. App. 2018) (additional noise, traffic, and children in the street – "harms that would be common to the community as a whole" – do not qualify as the personal special injury required to confer standing), *trans. denied*.

[13] The remaining injury alleged by Remonstrators is "their property values would decrease[.]" (Reply Br. at 9.) Appellees argue the decrease in property value is not a "direct injury" of the ERA declaration and abatement, but rather a product of the decision of the BZA. We would be inclined to agree with Appellees if the ERA designation and tax abatement were for business development generally, but in fact, the Council's decision explicitly applies only to the development of the Solar Project. The Confirmatory Resolution provided:

> 4. such redevelopment or rehabilitation activities and such manufacturing equipment as described in part 3, above, are **limited strictly to investments made for the purpose of generating electricity from solar energy for the public grid and to activities and equipment in direct support of such efforts, or to other purposes related thereto** and fully compliant with the Pulaski County Unified Development Ordinance, as amended, and any actions taken by the Pulaski County Advisory Plan Commission or Pulaski County Board of Zoning Appeals in their efforts to enforce and interpret aforesaid ordinance[.]

(Appellants' App. Vol. II at 69) (emphasis added). Thus, it seems clear the Council's adoption of this Confirmatory Resolution was as necessary for the Solar Project as was the decision of the BZA.

[14] Furthermore, we believe there is a distinction between the "market forces" referenced in *Solarize* and the market forces at play when a landowner's property value will shrink due to a government body's decision regarding adjacent land. *Solarize* involved a business and the market forces that might cause that business to no longer be as profitable due to shrinkage of customers or suppliers. That holding is more akin to *EP MSS LLC v. Merrillville Board of Zoning Appeals*, 192 N.E.3d 981 (Ind. Ct. App. 2022), *trans. denied*, wherein we held the owner of a storage facility does not have standing to appeal the grant of a special exception for another business to open a storage facility, because businesses do "not have a right to be free from competition" and the danger of losing business is not a "special injury." *Id*. at 987. In contrast, the injuries to property values expected to be experienced the Remonstrators herein are no less direct than when the Remonstrators were appealing the BZA's grant of the application for a special exception that would permit the building of the Solar Project. Both this Confirmatory Resolution by the Council and the grant of the special exception by the BZA make possible the development of the Solar Project on the Property. Accordingly, we hold Remonstrators have standing to appeal the Council's Confirmatory Resolution. *See Mammoth Solar*, 196 N.E.3d at 237 (decrease in property values expected to occur due to development of

solar farm confers standing on property owners to appeal special exception granted by BZA).

## 2. Definition of an ERA

Remonstrators argue the trial court erroneously read the statutory definition of an ERA to include farmland and failed to properly consider the legislature's recent amendment of the statute defining an ERA. Interpretation of a statute is a pure question of law that we review de novo.[3] *Jones v. Lofton*, 201 N.E.3d 676, 678 (Ind. Ct. App. 2022), *trans. denied*. Our goal when interpreting a statute is to give effect to the legislature's intent, and the best evidence of that intent is the language of the statute itself. *Id*. If a statute is unambiguous, we must give it its clear and plain meaning. *Id*. That parties disagree about the meaning does not make a statute ambiguous. *Southwest Allen Cnty. Fire Protection Dist. v. City of Fort Wayne*, 142 N.E.3d 946, 954 (Ind. Ct. App. 2020), *trans. denied*.

---

[3] The parties disagree about what our standard of review should be. Remonstrators assert the Council's declaration of the ERA is a quasi-judicial action like a zoning board's grant of a variance, (*see* Appellants' Br. at 7), while Appellees argue the grant of an ERA is a legislative action like the passage of any other resolution. (*See* Council's Br. at 11.) Because Remonstrators raise questions of law that we review de novo, we need not determine the precise contours of the appellate standard of review to be applied to other types of questions on appeal from a trial court's confirmation of the designating body's final action. Nevertheless, we note that, unlike in appeals from a zoning board, trial courts are authorized to "hear evidence on the appeal" from a council's declaration of an ERA. *Compare Burton v. Bd. of Zoning Appeals of Madison Cnty*., 174 N.E.3d 202, 209 (Ind. Ct. App. 2021) ("A trial court and an appellate court both review the decision of a zoning board with the same standard of review. A proceeding before a trial court or an appellate court is not a trial de novo[.]"), *trans. denied*, *with* Ind. Code § 6-1.1-12.1-2.5(e) ("The court shall hear evidence on the appeal, and may confirm the final action of the designating body or sustain the appeal."). This distinction alone suggests our standard of review from a trial court's determination regarding a council's resolution creating an ERA would be distinct from our standard of review for a BZA's grant of a special exception. *See GKN Co. v. Magness*, 744 N.E.2d 397, 401 (Ind. 2001) (When "a trial court conducts an evidentiary hearing, we give its factual findings and judgment deference." However, when the trial court makes factual findings based on a paper record, we give no deference to the trial court's factual findings.).

[16] Prior to July 1, 2022, an ERA was defined by statute as

> [a]n area which is within the corporate limits of a city, town, or county which has become undesirable for, or impossible of, normal development and occupancy because of a lack of development, cessation of growth, deterioration of improvements or character of occupancy, age, obsolescence, substandard buildings, or other factors which have impaired values or prevent a normal development of property or use of property. The term "economic revitalization area" also includes:
>
> (A) any area where a facility or a group of facilities that are technologically, economically, or energy obsolete are located and where the obsolescence may lead to a decline in employment and tax revenues; and
>
> (B) a residentially distressed area, except as otherwise provided in this chapter.

Ind. Code § 6-1.1-12.1-1(1) (2013).

[17] In the early months of 2022, Indiana's legislature amended that statute by adding a third subsection to statute that provides:

> (C) an area of land classified as agricultural land for property tax purposes that, as a condition of being designated as a revitalization area, will be predominantly used for agricultural purposes for a period specified by the designating body.

Ind. Code § 6-1.1-12.1-1(1) (2022). No modifications were made to the pre-existing portions of the statute.

Remonstrators argue "the Amended ERA Statute creates a presumption that the ERA statute governing this proceeding was intended to be changed to include agricultural/farmland, where it was excluded before." (Appellants' Br. at 11.) In support, Remonstrators quote an Indiana Supreme Court case that states:

> A fundamental rule of statutory construction is that an amendment changing a prior statute indicates a legislative intent that the meaning of the statute has changed. Such an amendment **raises the presumption that the legislature intended to change the law** unless it clearly appears that the amendment was passed in order to express the original intent more clearly.

(*Id*.) (quoting *United Nat. Ins. Co. v. DePrizio*, 705 N.E.2d 455, 460 (Ind. 1999)) (emphasis added by Remonstrators).

We take no issue with the statement of law quoted by Remonstrators. We do, however, disagree with the inference that Remonstrators draw from the statutory change that occurred. The trial court determined:

> 31. The amendment specifies that land that will continue to be used for agricultural purposes can be designated as an ERA. This language does not in any way suggest that the existing language of Ind. Code § 6-1.1-12.1-1 excluded farm property from being designated as an ERA for purposes of improvements and other development.

(Appellants' App. Vol. II at 28.) We agree. The legislature's creation of a category of ERA that "will be predominately used for agricultural purposes for a period specified[,]" Ind. Code § 6-1.1-12.1-1(1) (2022), does not preclude the

prior-existing definition of ERA from applying to farmland that will no longer be used for agricultural purposes, presuming of course the land meets the prior-existing definition provided in Indiana Code section 6-1.1-12.1-1(1) (2013).

[20] Remonstrators next argue that farmland that contains drainage tiling or watering systems has been "improved" or "developed" in a manner that precludes it from being designated an ERA. The statute's controlling language provides:

> "Economic revitalization area" means an area which is within the corporate limits of a city, town, or county which has become undesirable for, or impossible of, normal development and occupancy because of a lack of development, cessation of growth, deterioration of improvements or character of occupancy, age, obsolescence, substandard buildings, or other factors which have impaired values or prevent a normal development of property or use of property.

*Id.*

[21] We in no way underestimate the value and importance of farming as a hobby, profession, or even sacred calling because it produces the food required to sustain human life on this planet. Nevertheless, in the context of real property, derivations of the terms "develop" and "improve" consistently refer to the addition of buildings or structures to land. For example, "development" is: "1. A substantial human-created change to improved or unimproved real estate, including the construction of buildings or other structures. 2. An activity, action, or alteration that changes undeveloped property into developed

property." BLACK'S LAW DICTIONARY "development" (10th ed. 2004). A "developer" is a "person or company whose business is to buy land and then either to build on it or to improve the existing buildings there." *Id*. "developer". "Improved land" is "[l]and that has been developed; esp., land occupied by buildings and structures." *Id*. Moreover, the ERA statute itself indicates:

> "Redevelopment" means the construction of new structures, in economic revitalization areas, either: (A) on unimproved real estate; or (B) on real estate upon which a prior existing structure is demolished to allow for a new construction.

Ind. Code § 6-1.1-12.1-1(5) (2013). *See also* Ind. Code § 6-1.1-12.1-1(15) (2022) (defining "[n]ew agricultural improvement" as a "term [that] includes a barn, grain bin, or silo"). Based on these authorities, we cannot read "development" or "improvement" in the ERA definition to include drainage tiling or watering systems. Because the Property at issue was "undesirable for, or impossible of, normal development and occupancy because of a lack of development," Ind. Code § 6-1.1-12.1-1(1) (2013), the Council committed no error of law when it declared the Property an ERA and approved the tax abatement.

## Conclusion

[22]     Remonstrators had standing to appeal the Council's declaration of an ERA and grant of a tax abatement because the only development permitted in the ERA zone was the Solar Project, which undisputed evidence indicated would decrease Remonstrators' property values. Nevertheless, as a matter of law, the

farmland at issue met the definition required to be declared an ERA. Accordingly, we affirm the judgment of the trial court.

[23]    Affirmed.


Crone, J., and Weissmann, J., concur.