ATTORNEY FOR PETITIONER:
**BENJAMIN BLAIR**
FAEGRE DRINKER
BIDDLE & REATH LLP
Indianapolis, IN

ATTORNEYS FOR RESPONDENT:
**THEODORE E. ROKITA**
ATTORNEY GENERAL OF INDIANA
**LYDIA A. GOLTEN**
**STEPHEN J. REEN**
**MICHELLE R. WYATT**
DEPUTY ATTORNEYS GENERAL
Indianapolis, IN

# IN THE
# INDIANA TAX COURT

NEW CINGULAR WIRELESS PCS, LLC, )
)
    Petitioner, )
)
        v. )    Case No. 24T-TA-00004
)
INDIANA DEPARMENT OF )
STATE REVENUE, )
)
    Respondent. )

**FILED**
Mar 31 2026, 4:28 pm
**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

## ORDER ON PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

**FOR PUBLICATION**
**March 31, 2026**

MCADAM, J.

This is a case of first impression concerning the scope of Indiana's telecommunications equipment sales and use tax exemption. At the heart of the parties' dispute is the meaning of the phrase "radio or microwave transmitting or receiving equipment" and whether that phrase includes cell phones. The Department argues that the exemption is limited to equipment that is part of New Cingular's central network infrastructure, used to provide service to all of its customers, and is within New

1

Cingular's custody and control. However, based on the plain and ordinary meaning of the exemption's text, the Court finds that the exemption is not limited in the manner advanced by the Department and holds that New Cingular is entitled to an exemption for its cell phones. Accordingly, the Court grants summary judgment to New Cingular on the question of the exemption but denies summary judgment insofar as New Cingular seeks a refund of tax paid as there are outstanding factual matters that the parties have not briefed.

### FACTS & PROCEDURAL HISTORY[1]

New Cingular Wireless PCS, LLC is a telecommunications company that sells retail wireless telecommunications services and mobile phones. (*See* Jt. Stip. at 1–2 ¶¶ 3, 5, 6.) It is a subsidiary of AT&T Inc. and is engaged in business in Indiana and nationally. (Jt. Stip. at 1–2 ¶¶ 1, 3.)

In 2018 and 2019, New Cingular purchased cell phones (also referred to as "mobile handsets" by New Cingular), such as Apple iPhones and Samsung Galaxy devices, for the purpose of reselling the phones to its customers. (Jt. Stip. at 2 ¶¶ 4, 5, 6.) Because the phones were intended for resale, New Cingular did not pay sales tax on its purchase of the phones and, instead, provided the phone suppliers with gross retail tax exemption certificates. (*See* Jt. Stip. at 2 ¶ 6.) The certificates allowed New Cingular to purchase the phones tax free because it intended to hold them in inventory for resale to its customers at a later time.[2] (Jt. Stip. at 2 ¶ 6.)

---

[1] The parties have stipulated to the facts summarized in this section.

[2] Indiana's purchase for resale exemption provides that "[t]ransactions involving tangible personal property . . . are exempt from [sales] tax if the person acquiring the property acquires it for resale, rental, or leasing in the ordinary course of the person's business without changing the form of the property." IND. CODE § 6-2.5-5-8 (2008).

2

Ultimately, however, New Cingular did not resell all of the cell phones purchased in this way. At some point after buying the phones, New Cingular decided to use some of the phones to fulfill contractual obligations to a subset of its customers. (*See* Jt. Stip. at 2–3 ¶¶ 7, 8.) Those contractual obligations fell into two categories. In the first category, New Cingular gave phones to some customers free of charge "in association with, and conditioned upon, [the] customer's execution of a wireless telecommunication service contract for a specified amount of time." (Jt. Stip. at 2 ¶ 7.) In the second category, New Cingular provided new phones to existing customers to replace their broken phones pursuant to a mobile phone insurance policy purchased by the customers alongside their wireless service. (Jt. Stip. at 2–3 ¶ 8.)

When New Cingular withdrew the phones used to fulfill these contractual obligations from its inventory, it paid use tax to the Department on the purchase price of the phones in the amount of $2,735,296.43 for 2018 and $2,546,393.04 for 2019. (*See* Jt. Stip. at 3 ¶¶ 9, 11, 12.) Later, New Cingular requested a full refund for the use tax it paid for 2018 and 2019, claiming the phones were statutorily exempt from use tax. (Jt. Stip. at 3 ¶13, 4 ¶ 17; Jt. Stip. Ex. A; Jt. Stip. Ex. B.) New Cingular argued that the cell phones were exempt under Indiana Code § 6-2.5-5-13 ("Section 13"), which exempts purchases of certain telecommunications equipment from sales and use tax if the equipment is purchased by a person that provides retail telecommunications services. (*See* Jt. Stip. Ex. A at 2; Jt. Stip. Ex. B at 2.)

The Department's Utility Refunds Division denied New Cingular's refund claims on identical grounds, rejecting the claimed exemption under Section 13 and concluding that New Cingular owed sales and use tax on the phones it used to fulfill its contractual

obligations. (*See* Jt. Stip. Ex. A; Jt. Stip. Ex. B.) Addressing New Cingular's claim for an exemption under Section 13, the Refunds Division reasoned that cell phones are not the type of equipment exempted under the statute and that New Cingular was not the "end consumer" of the phones. (Jt. Stip. Ex. A at 2; Jt. Stip. Ex. B at 2.) The Refunds Division therefore concluded that, absent the exemption, the use of the phones to fulfill New Cingular's contractual obligations resulted in sales and use tax liability for New Cingular. (Jt. Stip. Ex. A; Jt. Stip. Ex. B.) The Refunds Division regarded the replacement cell phones given to customers pursuant to a mobile insurance policy as taxable property received pursuant to "optional warranty contracts," which the Refunds Division concluded required New Cingular to pay use tax on any phones exchanged or replaced under the warranty. (*See* Jt. Stip. Ex. A at 1; Jt. Stip. Ex. B at 1 (citing Department of Revenue Information Bulletin #2).) For the phones provided to customers in exchange for the execution of wireless telecommunications service contracts, the Refunds Division concluded that the phones were subject to sales tax. (*See* Jt. Stip. Ex. A at 2; Jt. Stip. Ex. B at 2.)[3]

After the Refunds Division issued its denials, New Cingular filed administrative protests with the Department's Legal Division. (Jt. Stip. at 4 ¶¶ 16, 20.) The Legal Division affirmed the refund denials by the Refunds Division on the grounds that the Section 13 exemption does not apply to either use of the cell phones by New Cingular. (*See* Jt. Stip. Ex. C at 4; Jt. Stip. Ex. D at 4.) The Legal Division stated:

> IC § 6-2.5-5-13 provides an exemption to a specific list of equipment used in providing telecommunication services. The exemption includes "radio or microwave transmitting or receiving equipment,"

---

[3] The Refunds Division was unable to determine whether sales tax had been collected and remitted by New Cingular for those phones, however, because New Cingular did not produce copies of any sales invoices as the Department requested. (Jt. Stip. Ex. A at 2; Jt. Stip. Ex. B at 2.)

and cell phones are that type of equipment. However, the use of the phones as radio or microwave transmitting or receiving equipment is performed by Taxpayer's customers and not by Taxpayer itself. Taxpayer's "use" of the phones is to provide the phones to customers via new contracts or replacement warranties while the exemption provided under IC § 6-2.5-5-13 is applicable to equipment used in providing telecommunication services. Taxpayer does not operate the cell phones as radio or microwave transmitting or receiving equipment; rather Taxpayer's customers use the phones in that manner. Further, the cell phones do not perform a function similar to the function performed by any of the property described in IC § 6-2.5-5-13(1)(A) as plainly required by IC § 6-2.5-5-13(1)(B). Ultimately, Taxpayer's reliance on IC § 6-2.5-5-13 is misplaced and this statute does not apply to Taxpayer's purchase and disposition of the cell phones under protest.

(Jt. Stip. Ex. C at 4; *accord* Jt. Stip. Ex. D at 4.) In conjunction with the Legal Division's protest determination, the Department also issued final orders denying both of New Cingular's refund claims. (Jt. Stip. at 4 ¶ 21.)

New Cingular appealed both denial orders to this Court. The parties have now filed cross motions for summary judgment asking the Court to grant summary judgment on all issues in this matter. (*See* Pet'r's Mot. Summ. J. at 2–3; Resp't's Mot. Summ. J. at 2.) Both parties agree that there are no genuine issues of material fact and that the motions turn entirely on questions of law. (*See* Pet'r's Mot. Summ. J. at 1; Resp't's Mot. Summ. J. at 1–2.) This Court heard oral arguments on the parties' motions and subsequently requested additional briefing on a pair of questions raised by the cross motions.

## STANDARD OF REVIEW

Summary judgment is proper only when the designated evidence demonstrates that no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C). Summary judgment is appropriate "if

5

it is sustainable on any theory or basis found in the evidentiary matter designated to the trial court." *Beradi v. Hardware Wholesalers, Inc.*, 625 N.E.2d 1259, 1261 (Ind. Ct. App. 1993). However, "[s]ummary judgment shall not be granted as of course because the opposing party fails to offer opposing affidavits or evidence, but the court shall make its determination from the evidentiary matter designated to the court." Ind. Trial Rule 56(C). "When reviewing a motion for summary judgment, the Court will construe all properly asserted facts and reasonable inferences drawn therefrom in favor of the non-moving party." *Crown Prop. Grp., LLC v. Ind. Dep't of State Revenue*, 135 N.E.3d 671, 675 (Ind. Tax Ct. 2019). "Cross-motions for summary judgment do not alter this standard." *Id.* Because the Tax Court reviews final determinations of the Department *de novo*, IND. CODE § 6-8.1-5-1(i) (2019), the Court is not bound by the evidence or the issues raised at the administrative level, *see Subaru-Isuzu Auto., Inc. v. Indiana Dep't of State Revenue*, 782 N.E.2d 1071, 1073 (Ind. Tax Ct. 2003).

## DISCUSSION

The issue presented for the Court's consideration by the parties is whether New Cingular's use of cell phones to fulfill its contractual obligations to certain customers is exempt from the use tax by operation of Section 13. The Department asserts that the exemption is not applicable to New Cingular's use on two separate grounds. It first argues that cell phones are not a type of property covered by the telecommunications exemption because, while cell phones are "radio or microwave transmitting or receiving equipment," the context of the exemption is limited to a provider's "central infrastructure" that provides service to all customers and remains within the provider's custody and control. In the alternative, the Department argues that, even if cell phones are covered,

6

the exemption still does not apply because New Cingular was not the person "acquiring" the phones as required by the exemption statute when it used the phones to fulfill its contractual obligations to its customers.

The Court disagrees with the Department in both instances. Section 13 does not limit the exemption to a subset of "radio or microwave transmitting or receiving equipment." The exemption includes tools used in and adapted to facilitate the sending or receiving of radio or microwaves. Because the cell phones at issue in this case transmit and receive radio waves and microwaves and are necessary to access New Cingular's wireless telecommunications services, they qualify for the exemption. Furthermore, New Cingular is the party acquiring the taxable property for the purposes of the exemption because the relevant "acquisition" for purposes of applying the exemption here is New Cingular's acquisition of the cell phones from its suppliers. For these reasons, the Court grants partial summary judgment to New Cingular.

## I.    The Exemption under Indiana Code § 6-2.5-5-13.

The exemption that New Cingular invokes in this case generally exempts specific types of telecommunications equipment acquired by certain persons.[4] To receive the exemption, a person must satisfy three elements: (1) there must be a transaction involving tangible personal property; (2) the property must be of a certain type; and (3) the person acquiring the property must either be a telecommunications service provider or use the property to provide certain services. IND. CODE § 6-2.5-5-13. The exemption statute provides in whole:

---

[4] The plain text of Indiana Code § 6-2.5-5-13 ("Section 13") is a sales tax exemption but is applicable to use tax transactions that meet the requirements of Indiana Code § 6-2.5-3-4(a)(2). Neither party argues that the transactions at issue here do not satisfy those requirements.

Transactions involving tangible personal property are exempt from the state gross retail tax, if:

(1) the property is:

(A) classified as central office equipment, station equipment or apparatus, station connection, wiring, or large private branch exchanges according to the uniform system of accounts which was adopted and prescribed for the utility by the Indiana utility regulatory commission;

(B) mobile telecommunications switching office equipment, radio or microwave transmitting or receiving equipment, including, without limitation, towers, antennae, and property that perform a function similar to the function performed by any of the property described in clause (A); or

(C) a part of a national, regional, or local headend or similar facility operated by a person furnishing video services, cable radio services, satellite television or radio services, or Internet access services; and

(2) the person acquiring the property:

(A) furnishes or sells intrastate telecommunication service in a retail transaction described in IC 6-2.5-4-6; or

(B) uses the property to furnish: (i) video services or Internet access services; or (ii) VOIP services.

*Id.*

The parties' disagreement on summary judgment exclusively revolves around the second and third elements of the exemption. Neither party disputes that the first element of the exemption is met — that there is a transaction involving tangible personal property. Instead, they disagree (1) whether cell phones are an exempt type of property covered by the phrase "radio or microwave transmitting or receiving equipment" and (2) whether New Cingular can satisfy the third element since it was not the party "acquiring" the phones when it used them to fulfill its contractual obligations to

8

its customers. As such, the Court's analysis will focus on these two aspects of the exemption statute.

## II.     The exemption includes New Cingular's cell phones.

Resolving the disagreement about the second element of the exemption (i.e., the scope of the statutory phrase "radio or microwave transmitting or receiving equipment") turns on whether the statutory phrase should be understood according to its plain and ordinary meaning alone or whether that meaning is narrowed by other words in the exemption statute. New Cingular urges this Court to simply apply the plain and ordinary meaning, arguing that the phrase comprises any and all implements which send ("transmit[ ]") or accept ("receiv[e]") radio-frequency electromagnetic signals ("radio") or high-frequency electromagnetic signals ("microwave") or any combination thereof. The Department contends that the interpretive exercise is more nuanced. It says the term is limited by the surrounding context of the exemption statute and the nature of the other types of property listed in Subpart 1(A) of the exemption. Under the Department's theory, the exemption applies only to equipment (1) that is within "New Cingular's custody and control and is used to provide service to all of New Cingular's customers" and (2) that is "central infrastructure used by New Cingular in their day-to-day business."[5] (Resp't's Suppl. Br. at 3, 7–8; *see also* Resp't's Resp. Pet'r's Suppl. Br. at 2). The Department's interpretation hinges on both its view of the statute's overall purpose and how it understands the clause in Section 13, immediately following the

---

[5] While the Department's original briefing emphasized that the "exemption target[ed] providers' large-scale, central infrastructure investments," (Resp't's Br. Supp. Mot. Summ. J. at 12), the Department appears to have recalibrated that argument in its supplemental briefing by removing the "large-scale" limitation and adding both a "custody and control" and a universal service requirement. (*See generally* Resp't's Suppl. Br.; Resp't's Resp. Pet'r's Suppl. Br.) The Court considers each of the Department's proposed qualifications but finds that they all fail since they lack support in the exemption statute.

words "radio or microwave transmitting or receiving equipment." That clause provides that exempt equipment "include[s], without limitation, towers, antennae, and property that perform a function similar to the function performed by any of the property described in clause (A)." IND. CODE § 6-2.5-5-13. According to the Department, to qualify for exemption, any "radio or microwave transmitting or receiving equipment" must perform a function similar to a type of property listed in that "including, without limitation" clause. (*See* Resp't's Resp. Pet'r's Suppl. Br. at 5.)

The Court ultimately cannot accept the Department's proposed interpretation. The phrase "radio or microwave transmitting or receiving equipment" does not include the limitations engrafted by the Department. When the words are understood by their plain and ordinary meaning, the phrase broadly describes items, such as cell phones, that are used in and adapted to facilitate either the sending or receiving of radio waves or microwaves. Since New Cingular's cell phones contain devices that allow the transmission and reception of radio waves or microwaves and are necessary to access New Cingular's telecommunications services, (Jt. Stip. at 2 ¶ 5), the exemption applies to the cell phones at issue.

A. *The Context of the Statute as a Whole.*

The keystone of the Department's argument is that the "statute as a whole" evinces a legislative intent to limit the exemption to those portions of a telecommunications provider's central network infrastructure that are within the provider's custody and control and used to provide service to all customers. (Resp't's Br. Supp. Mot. Summ. J. at 11–12; Resp't's Suppl. Br. at 7–8.) The Department asserts that all of the other types of exempt property listed in the statute are part of a

10

telecommunications provider's central infrastructure, while cell phones are not. (Resp't's Br. Supp. Mot. Summ. J. at 12.) The Department thus contends that cell phones are not included in the term "radio or microwave transmitting or receiving equipment" because they are unlike the other equipment expressly described in the exemption statute.

The Department, however, takes for granted the meaning of the words used in Section 13. Many of the statutory terms used in the exemption statute carry peculiar meaning specifically derived from the telecommunications industry and thus require reference to industry-specific sources. IND. CODE § 1-1-4-1(1) (2005). *See Loomis v. ACE Am. Ins.*, 244 N.E.3d 908, 916 (Ind. 2024) (indicating that specialized dictionaries and industry context help elucidate these terms' "peculiar and appropriate meaning in law"). In fact, the legislature has specifically indicated that many of the terms underlying the Department's argument are to be understood according to their classification in the uniform system of accounts adopted by the Indiana Utility Regulatory Commission. *See* IND. CODE § 6-2.5-5-13(1)(a). Take for example, "central office equipment." In another industry, this composite term might include general equipment for a company's central business office, no matter the device or type of apparatus.[6] The term's true meaning, though, lies hidden and is understood properly only with reference to the specific context from which it is plucked: the telecommunications industry. Central offices in the telecommunications industry are not, say, the corporation's headquarters, but rather telephone network facilities where phone subscribers' lines are joined to switching equipment. *See Central office*, NEWTON'S TELECOM DICTIONARY 194 (6th ed. 1993)

---

[6] "Office," after all, means merely a "room or building used as a place of business" or a "room or area for a particular business." *Office*, THE OXFORD DESK DICTIONARY 400 (1995).

11

[hereinafter NEWTON'S TELECOM DICTIONARY]. In that sense, "central office equipment" bears a particular non-ordinary meaning, separate from normal office equipment.

To be sure, some of the terms listed in the exemption appear to align with the Department's proposed interpretive gloss, but others belie its viability altogether. For example, the terms "central office equipment," "mobile telecommunications switching office equipment," and "headend" seem to contemplate, at least in part, property and equipment whose function might reasonably be characterized as central network infrastructure controlled by the telecommunications provider and used to serve a portion of the customer base. In the industry,

- "Central office equipment" refers to equipment for a "central office," or a "[t]elephone company facility where subscribers' lines are joined to switching equipment for connecting other subscribers to each other, locally and long distance." *Central office*, NEWTON'S TELECOM DICTIONARY at 194.

- "Mobile telephone switching office" refers to a "switch that serves to interconnect fixed base station (BS) antennas and, thereby, to interconnect radio cells and the mobile stations (MSs) within them." *Mobile telephone switching office*, WEBSTER'S NEW WORLD TELECOM DICTIONARY 324 (2008) [hereinafter WEBSTER'S TELECOM DICTIONARY].[7] And,

- "Headend" refers to "[t]he originating point of a signal in cable TV systems" or "[a] central control device required within some [local area

---

[7] While the statute employs the term "mobile telecommunications switching office equipment," the Court was only able to locate a definition for the related term "mobile *telephone* switching office," which appears to be analogous.

network/metropolitan area network] systems to provide . . . centralized functions . . . ." *Headend*, NEWTON'S TELECOM DICTIONARY at 478.

Yet, several other terms (*e.g.*, "station equipment," "station . . . apparatus," and "large private branch exchanges") plainly contemplate small-scale, decentralized, customer-sided equipment, owned and controlled by a telecommunications provider's customers:

- "Station" refers a "terminal or endpoint on a network, such as a *telephone set* or data terminal." *Station*, WEBSTER'S TELECOM DICTIONARY at 460 (emphasis added). *See also Station*, NEWTON'S TELECOM DICTIONARY at 930 ("a telephone . . . or a telephone instrument.").

- "Station equipment" refers to "[t]elephone instruments and associated equipment furnished to subscribers." *Station equipment*, NEWTON'S TELECOM DICTIONARY at 931 (emphasis added).

- "Station apparatus" refers to "teletypewriter equipment,[8] telephone and miscellaneous equipment, small private branch exchanges and radio equipment (excluding mobile), installed for customer's use."[9] Common Carrier Services, 51 FED. REG. 43498, 43517 (Dec. 2, 1986) (emphasis added). And,

- "Private branch exchange," irrespective of whether the adjective "large" appears before it or not, refers to, "[i]n the simplest terms[,] . . . a telephone

---

[8] A teletypewriter refers to a "telegraph device capable of transmitting and receiving alphanumeric information over communication channels. It may also contain a keyboard similar to that of a typewriter or computer but usually with fewer keys." *Teletypewriter*, NEWTON'S TELECOM DICTIONARY at 980.

[9] Unlike other terms appearing in Section 13, "station apparatus" is expressly discussed by the federal uniform system of accounts referenced in the statute. *See* Common Carrier Services, 51 FED. REG. 43498, 43517 (Dec. 2, 1986); *see also* IND. CODE § 6-2.5-5-13(1)(A); 170 IND. ADMIN. CODE 7-2.1-1 (adopting by reference 51 FED. REG. 43498, Common Carrier Services, 53 FED. REG. 30058 (1988)).

13

switch that . . . performs basic functions to provide communications services to users within an organization." *Private branch exchange*, McGRAW-HILL DESKTOP ENCYCLOPEDIA OF TELECOMMUNICATIONS 835 (3d ed. 2002).[10] A private branch exchange "serv[es] a single organization," "provides for switching calls between any two extensions served by the exchange or between any extension and the national telephone system via trunk to a central office," and is "usually located on the customer's premises." McGRAW HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS 1674 (6th ed. 2003) [hereinafter McGRAW-HILL SCIENTIFIC].

In the end, whatever categorical throughline connects the types of property exempted by Section 13, it cannot be said with any certainty that that throughline excludes cell phones. With the technical meanings of these terms front and center, it becomes apparent that the telecommunications exemption embraces a mixture of large- and small-scale, centralized and decentralized, provider- and customer-sided property. At a minimum, the inclusion of the terms "station equipment" and "station apparatus," whose dictionary and statutory definitions refer to telephones and telephone instruments, undermines the Department's best attempts to pigeonhole the statute as a recitation of only sizable or extensive, centrally-located, and company-facing equipment. And, while the record lacks evidence that would allow the Court to make any definitive findings, common sense and experience in the twenty-first century further suggest that cell phones likely serve a similar purpose in a wireless telecommunications system to

---

[10] A "large private branch exchange" is nothing more than private branch exchange of greater size and complexity, usually with 100 or more lines and consisting of multiple, smaller private branch exchanges. *See* 51 FED. REG. at 43517.

that served by wired telephones in a wired telecommunications system. *See*

IND. CODE § 6-2.5-5-13(1)(B) (exempting "radio or microwave transmitting or receiving

equipment, including, without limitation, towers, antennae, and property *that perform a*

*function similar to the function performed by any of the property described in clause (A)*"

(emphasis added)). While cell phones offer greater portability and functionality than

wired telephones, both stand at the very "end of the line" and serve as the customer's

access point to the provider's network.[11]

The Court declines the invitation to superimpose a speculative view of the

exemption's purpose onto the statute. It would be improper to "say that since the overall

purpose of the statute is to achieve *x*, any interpretation of the text that limits the

achieving of *x* must be disfavored." ANTONIN SCALIA & BRYAN GARNER, READING LAW: THE

INTERPRETATION OF LEGAL TEXTS 168 (2012). The Department's position simply lacks

textual support. The statute does not use the term "infrastructure," nor does it limit the

exemption to property in the custody or control of the provider that is used to serve all of

the provider's customers. And it does not include any express language that would

suggest such restrictions. Ultimately, adopting such a limitation would laden the

exemption with judicial barnacles more likely to confuse than simplify. *See Ames v.*

*Ohio Dep't of Youth Servs.*, 605 U.S. 303, 313 (2025) (Thomas, J., with whom Gorsuch,

J., joins, concurring) (noting that judge-made doctrines "have a tendency to distort the

---

[11] Telecommunications dictionaries confirm that both wired and wireless telephones are devices that sit on the customer's side of the network and serve as the point of access. *See CPE (Customer Premises Equipment)*, WEBSTER'S TELECOM DICTIONARY at 115 (defining customer premises equipment (CPE) as equipment on "the customer side of the demarcation point," including "telephone sets"); *CPE*, NEWTON'S TELECOM DICTIONARY at 253 (defining CPE as equipment "on the customer's premises"). *Cf. Customer provided terminal equipment*, NEWTON'S TELECOM DICTIONARY 356 (27th ed. 2013) (defining CPE as "[t]erminal equipment connected to the telephone network" — that is, the customer's access point — "which is owned by the user or leased from a supplier other than the local telephone operating company").

underlying statutory text, impose unnecessary burdens on litigants, and cause confusion for courts"). Had the legislature intended to limit the exemption's scope as the Department urges, it could easily have done so. But it did not, and the Court will not engraft these novel limitations onto the statute. *See Indiana Alcohol & Tobacco Comm'n v. Spirited Sales, LLC*, 79 N.E.3d 371, 376 (Ind. 2017) (indicating that courts "may not add new words to a statute which are not the expressed intent of the legislature") (citing *Kitchell v. Franklin*, 997 N.E.2d 1020, 1026 (Ind. 2013).

B. *The Effect of "including, without limitation."*

The Department also argues that the meaning of the term "radio or microwave transmitting or receiving equipment" is limited by the list that immediately follows it. That list modifies the phrase and reads "including, without limitation, towers, antennae, and property that perform a function similar to the function performed by any of the property described in clause (A)." IND. CODE § 6-2.5-5-13(1)(B). The Department borrows from its earlier argument in supporting this one, contending that the inclusion of "property described in clause (A)" means that the term "radio or microwave transmitting or receiving equipment" limits the property to a telecommunications provider's "central infrastructure." In addition to the reasons articulated above, the Department's argument fails because it misconstrues the statutory phrase, "including, without limitation" and imbues it with a restrictive effect rather than an expansive one. Properly understood, the "including, without limitation" clause serves to expand the universe of exempt "radio or microwave transmitting or receiving equipment."

The word "including" can imply different meanings depending on the context. Ordinarily, the word "including" is used "as a term of limitation, as specifying particularly

16

that which belongs to the genus," to a particular category of things. *Estate of Meyer*, 668

N.E.2d 263, 265 (Ind. Ct. App. 1996) (quoting *Department of Treasury v. Muessel*, 32

N.E.2d 596, 598 (Ind. 1941)). However, "[t]he word 'including' may be used as meaning

'also' or 'in addition to', that is, as a term of enlargement." *Id.* When the term "including"

is intended as a term of enlargement rather than a term of limitation, then "including" is

often modified with phrases such as "but not limited to." *See id.* (observing that if

"including" had been intended as a term of enlargement, it would have been modified

with a phrase such as "but not in limitation of the foregoing") (citing *Muessel*).

Here, the word "including" is used as a term of illustration or enlargement and not

of limitation. Section 13 does not use the term "including" in isolation but joins it with the

phrase "without limitation." *See* IND. CODE § 6-2.5-5-13(1)(B). The juxtaposition of the

two obviates the need to guess at meaning. The phrase "without limitation" denotes that

the word "including" is not used in its restrictive sense and should instead be

understood to expand the meaning of the phrase it modifies. Put simply, the words

"including, without limitation" here mean "in addition to" and are designed to illustrate or

expand the category of exempt property qualified for Section 13's exemption. The

Department's understanding would read the phrase "without limitation" out of the statute

and render it meaningless. Such a reading would contradict the surplusage canon

articulated by our Supreme Court, providing that "courts should give effect to every word

and eschew those interpretations that treat some words as duplicative or meaningless."

*Cutchin v. Beard*, 171 N.E.3d 991, 997 (Ind. 2021) (quoting *Estabrook v. Mazak Corp.*,

140 N.E.3d 830, 836 (Ind. 2020)) (internal quotation marks omitted). By enlarging the

category of property qualified as "radio or microwave transmitting or receiving

17

equipment," the "including, without" limitation clause adds to, rather than subtracts from, the category of exempt equipment. The clause makes clear that towers, antennae, and other property with a functionality similar to that performed by property listed in Subpart 1(A) are firmly and unequivocally included as exempt.[12]

Absent express language to the contrary, the Court will not read the "including, without limitation" clause to narrow the meaning of the phrase "radio or microwave transmitting or receiving equipment."

C. *The meaning of "radio or microwave transmitting or receiving equipment."*

Having addressed the Department's arguments about the overall context of the statute and its "including, without limitation" clause, the Court must determine whether the cell phones in question qualify as "radio or microwave transmitting or receiving equipment." As a threshold matter, the Court must first ascertain whether the term, as used in the exemption statute, is properly understood according to its plain and ordinary meaning or whether it should be given a technical, "peculiar . . . meaning." IND. CODE § 1-1-4-1(1). As discussed previously, many of the other terms used in the statute appear to have a specialized, technical meaning that is peculiar to the telecommunications industry. With regard to "radio or microwave transmitting or receiving equipment," however, the parties agree that, rather than having technical import, the words are best understood by their plain and ordinary meaning.

---

[12] The "including, without limitation" clause may actually point in the direction opposite to the one urged by the Department. As mentioned above, Subpart 13(1)(A) includes "station equipment" and "station . . . apparatus" which include "telephone and miscellaneous equipment . . . installed for customer's use," per the uniform system of accounts. *See* 51 FED. REG. at 43517. Cell phones appear, at least on their face, to "perform a function similar" to landline telephones and teletypewriters, albeit in a wireless telecommunications system rather than a wired one. Nonetheless, the Court does not address this possibility as neither party has advanced this issue.

18

The Court agrees with the parties that "radio or microwave transmitting or receiving equipment" lacks special technical import and should be understood in accordance with its plain and ordinary meaning. Unlike other terms listed in Section 13, "radio or microwave transmitting or receiving equipment" has no peculiar meaning in either the law or the telecommunications industry that differs from the ordinary meaning of the phrase itself. *See* IND. CODE § 1-1-4-1(1); *see also Johnson Cty. Farm Bureau Co-op Ass'n v. Indiana Dep't of State Revenue*, 568 N.E.2d 578, 581 (Ind. Tax Ct. 1991), *aff'd*, 585 N.E.2d 1336 (Ind. 1992) ("Since words that have one meaning in a particular context frequently have a different meaning in another context, it is necessary to consider the context to determine the significance of the words used in a statute."). Tellingly, none of the telecommunications dictionaries identified by the Court define the exact phrase-as-a-term ("radio or microwave transmitting or receiving equipment") or any of its subordinate components (*e.g.*, "radio transmitting equipment," "microwave receiving equipment," etc.). While a few industry sources define adjacent phrases such as "radio receiver" or "radio transmitter," the accompanying word "equipment" is omitted from the thing which is defined in every instance, in violation of the surplusage canon. *See, e.g.*, MCGRAW-HILL SCIENTIFIC at 1340 (defining "microwave receiver"), 1739 (defining "radio receiver"), 1740 (defining "radio transmitter") (6th ed. 2003). Despite the availability of these technical terms, the General Assembly elected to not use them. Instead, it chose broader, more general categorical language that referenced a type of equipment based on its functions ("receiving" or "transmitting"). This indicates to the Court that the General Assembly intended the complete phrase, "radio or microwave transmitting or receiving equipment," to be understood according to an "ordinary and

19

accepted dictionary meaning" and not in reference to an independent technical import (were one to exist).[13] *Johnson Cty. Farm Bureau Co-op Ass'n*, 568 N.E.2d at 581. Accordingly, the Court finds that the plain and ordinary meaning controls.

Turning to the meaning of the exemption, the Court finds that the composite phrase "radio or microwave transmitting or receiving equipment" includes four subcategories of devices: radio transmitting equipment, radio receiving equipment, microwave transmitting equipment, and microwave receiving equipment. Examining the meaning of each individual word is helpful in piecing together the common meaning of each subordinate term:

- "Radio," in its adjectival form, means "having to do with electromagnetic wave frequencies between c. 10 kilohertz and c. 300,000 megahertz." *Radio*, WEBSTER'S NEW WORLD COLLEGE DICTIONARY 1107 (3d ed. 1996) [hereinafter WEBSTER'S NEW WORLD COLLEGE].

- "Microwave," in its adjectival form, means "designating or of that part of the electromagnetic spectrum associated with the larger infrared waves and the shorter radio waves: used for radar, communications, etc. and generally regarded as from 300,000 to 300 megahertz." *Microwave*, WEBSTER'S NEW WORLD COLLEGE at 857.

---

[13] Section 13's mention of numerous items that bear peculiar meaning in the telecommunications industry provides caution against application of the plain and ordinary meaning here. At the end of the day, however, those industry-specific terms have technical significance that is clear and readily ascertainable, *see supra* Section II.A. (pointing out the industry definition of "central office equipment," among others), whereas "radio or microwave transmitting or receiving equipment" does not, despite the Court's best efforts to locate it.

- "Transmitting" means "send[ing] or caus[ing] to go from one person or place to another, esp. across intervening space or distance; transfer[ing]; dispatch[ing]; convey[ing]," or "send[ing] out (radio or television broadcasts, etc.) by electromagnetic waves." *Transmitting*, WEBSTER'S NEW WORLD COLLEGE at 1421.

- "Receiving" means "tak[ing] or get[ting] (something given, offered, sent, etc.)," *Receiving*, WEBSTER'S NEW WORLD COLLEGE at 1120, or "acquir[ing] or tak[ing] (something . . . transmitted)." *Receiving*, WEBSTER'S II NEW COLLEGE DICTIONARY 924–25 (1995).

- "Equipment" means "the implements (as machinery or tools) used in an operation or activity," *Equipment*, WEBSTER'S THIRD INTERNATIONAL DICTIONARY 768 (1961, 2002 reprint) [hereinafter WEBSTER'S THIRD], specifically tools "adapted to facilitate a given work." *Implement*, WEBSTER'S THIRD at 1134 It can also refer to a "set of tools, kit, etc., assembled for a specific purpose." *Equipment*, COLLINS ENGLISH DICTIONARY AND THESAURUS 379 (1993).

When assembled, the following meanings emerge for each of the subcategories:

- "Radio transmitting equipment" is an item used in and adapted to facilitate the sending of electromagnetic radio wave frequencies.

- "Radio receiving equipment" is an item used in and adapted to facilitate the acquiring of electromagnetic radio wave frequencies.

- "Microwave transmitting equipment" is an item used in and adapted to facilitate the sending of larger infrared or shorter radio electromagnetic wave frequencies.

21

- "Microwave receiving equipment" is an item used in and adapted to facilitate the acquiring of larger infrared or shorter radio electromagnetic wave frequencies.[14]

While qualifying under at least one subcategory suffices, the subcategories themselves needn't be mutually exclusive — devices can, for example, both transmit and receive signals. *See, e.g., Transceiver*, WEBSTER'S NEW WORLD COLLEGE at 1419 (defining "transceiver" as an "apparatus contained in a single housing, functioning alternately as a radio transmitter and receiver").

From these plain and ordinary meanings, the Court finds that New Cingular's cell phones qualify for Section 13's exemption. As the parties jointly stipulate, devices allowing the transmission and reception of telecommunications signals, including radio waves or microwaves, are contained within, or integrated into, the cell phones in question. (*See* Jt. Stip. at 2 ¶ 5.) And devices like the cell phones in question are required for customers to use New Cingular's wireless telecommunications services. (*See* Jt. Stip. at 2 ¶ 4.) These facts demonstrate that the cell phones at issue are used in and adapted to facilitate the sending and receiving of radio or microwave frequencies.

This conclusion aligns with the Department's own view of the matter. At both the administrative level and before this Court, the Department has consistently maintained that the cell phones at issue "are in fact 'radio or microwave transmitting or receiving equipment.'" (Resp't's Br. Supp. Mot. Summ. J. at 12; Resp't's Resp. Pet'r's Mot. Summ. J. at 2; Jt. Stip. Ex. C at 16, Jt. Stip Ex. D at 16.) ("The exemption includes 'radio

---

[14] As noted previously, some specialized or industry sources define terms that are closely related, such as "radio receiver." Notwithstanding that those terms omit the word "equipment," their definitions help confirm the meanings of the relevant subcategories. A "radio receiver," for example, means a "device that converts radio waves into intelligible sounds or other perceptible signals. Also known as radio; radio set; receiving set." *Radio receiver*, MCGRAW-HILL SCIENTIFIC at 1739. *See also* MCGRAW-HILL SCIENTIFIC at 1740 (defining "radio transmitter"), 1340 (defining "microwave receiver").

or microwave transmitting or receiving equipment,' and cell phones are that type of equipment.").) The categorization of the cell phones as "radio or microwave transmitting or receiving equipment" under the plain and ordinary meaning of the phrase has never been at issue. Instead, the Department has freely conceded this point in favor of its view that other features of the statutory text remove the cell phones at issue from the ambit of the exemption. With the Court rejecting those interpretive arguments, the Department's view aligns with the Court's.

## III. New Cingular is "the person acquiring the property" for use tax purposes.

The Court now turns to the Department's alternative argument regarding the third and final element of the exemption — that the person acquiring the property either sells retail telecommunications services or uses the property to provide certain other services (i.e., video, internet access, or VoIP). The parties agree that New Cingular sells retail interstate telecommunications services as defined by the exemption, but the Department claims that New Cingular is not entitled to the exemption because it is "not the party 'acquiring' the [cell phones]" as required by Subpart 13(2)(A). According to the Department, the exemption does not apply because "New Cingular's *customers* . . . acquired and utilized the [cell phones] as 'transmitting or receiving equipment,'" and not New Cingular, who "only acquired [them] as a means to satisfy its agreements." (Resp't's Resp. Pet'r's Mot. Summ. J. at 4.) New Cingular responds that the Department's argument contradicts its position that New Cingular owes use tax on the cell phones in the first instance because, if it was the Department's contention that New Cingular did not acquire the cell phones, then New Cingular would owe no use tax.

23

The Court agrees with New Cingular that the Department is mistaken. Subpart 13(2) speaks to an acquisition that is relevant to the transaction Section 13 contemplates exempting. The use tax liability in question — New Cingular's, for which a refund of payments is now sought — arose directly from New Cingular's *acquisition*, and eventual use, of the cell phones at issue, not its customer's. The Department, in its attempts to construe the relevant acquisition as the customer's, and not New Cingular's, misapplies the use tax exemption statute and skips over the particulars of the relevant initial set of transactions that gave rise to the use tax liability at the center of this case. For the Department, the relevant transactions are those which end with New Cingular's customers receiving the cell phones. This is incorrect.

Whether the use, storage, or consumption of taxable property is exempt from use tax depends on whether the acquisition of the property was exempt from sales tax (i.e., the exemption of New Cingular's use of the phones depends on whether its purchase of the phones was exempt from sales tax). This is because Indiana's sales and use tax exemptions are expressly styled as sales tax exemptions (*i.e.*, the exemptions apply to transactions, not to use, storage, or consumption), *see generally* IND. CODE § 6-2.5-5, and are applied, with limited exception, to the use tax through IND. CODE § 6-2.5-3-4. Under Indiana Code § 6-2.5-3-4, the use, storage, or consumption of property "is exempt from the use tax if . . . the property was acquired in a transaction that is wholly or partially exempt from the state gross retail tax . . . and the property is being used, stored, or consumed for the purpose for which it was exempted." IND. CODE § 6-2.5-3-4(a)(2).

24

Applying the principle to the facts here requires a clear understanding of the two different sets of transactions at play. In the first set of transactions, New Cingular purchased cell phones from its suppliers (*e.g.*, Apple, Samsung, etc.) exempt from sales tax under the sale-for-resale exemption. (Jt. Stip. at 2 ¶ 6.) In the second set of transactions, New Cingular transferred some of those cell phones to certain customers in accordance with its contractual obligations (i.e., in exchange for a customer entering into a wireless service contract or to replace damaged phones under an insurance program). (Jt. Stip. at 1–2 ¶¶ 7, 8.) The Court need only look to the particulars of the first set of retail transactions and its attendant tax consequences to resolve this case.

Turning to the telecommunications exemption in Section 13, then, means the reference in Subpart 13(2) to the "person acquiring the property" is to the person whose acquisition (and subsequent use) is the basis for the sales tax liability in the first transaction. By its text, Section 13 is a sales tax exemption. *See* IND. CODE § 6-2.5-5-13 ("Transactions involving tangible personal property are exempt from *the state gross retail tax*, if . . . .") (emphasis added). Because use tax exemptions apply based on whether the user's acquisition was exempt from sales tax, if that person's *acquisition* of the property being used would be exempt from *sales tax* under Section 13, that person's *use* can be exempt from *use tax* under Section 13.

Therefore, New Cingular's use of the cell phones to fulfill its contractual obligations to its customers is exempt from use tax under Section 13 if its acquisition of the cell phones from its suppliers would be exempt from the *sales tax* under Section

25

13.[15] Thus, for use tax purposes, the reference in Section 13 to "the person acquiring the property" is to the acquisition of the property by the person using the property (New Cingular). It is not referring to the person acquiring the property (New Cingular's customers) from the person using the property (New Cingular). This is because the question is whether New Cingular's use, not its customers' acquisition, is exempt from use tax. The interdependence of the use tax on a sales tax exemption requires the words to be framed and understood through the lens of the user.

The Department's contrary argument conflates these two distinct transactions and incorrectly focuses on the acquisition of the phones (by New Cingular's customers) in the second transaction instead of the use of the phones (by New Cingular) in the second transaction. But, as explained above, for purposes of whether Section 13 exempts New Cingular's use, the relevant acquisition is New Cingular's (from its suppliers) and the relevant use is New Cingular's (to fulfill its contractual obligations). The acquisition and use of the phones by New Cingular's customers is a wholly distinct question with its own potential tax consequences. Those customers may accrue their own sales and use tax liabilities as a result of their acquisition and use of the phones.

Having established that the relevant acquisition is New Cingular's purchase of the phones from its suppliers, the remaining question is whether that acquisition would have been exempt from sales tax under Section 13. It would. The parties have jointly stipulated that, during the relevant tax years, New Cingular was engaged in the

_____

[15] Of course, Indiana Code § 6-2.5-3-4(a)(2) also requires that the property is "used, stored, or consumed for the purpose for which it was exempted." However, the Department does not argue that Section 6-2.5-3-4 precludes the application of the exemption in Section 13 to New Cingular. Moreover, Subpart 13(2)(A), which New Cingular invokes, is a status-based exemption and does not appear to condition the exemption on any particular use of or purpose for the property.

26

business of furnishing and selling, among other things, intrastate telecommunications service in retail transactions to customers within and outside Indiana, and that New Cingular Wireless received gross retail income from billings rendered to customers. (Jt. Stip. at 1–2 ¶ 3.) Because that stipulation satisfies Section 13's third element and because the Court finds above that New Cingular's cell phones qualify as exempt equipment under Section 13, New Cingular's acquisition of the phones from its suppliers would have been exempt from sales tax.

### CONCLUSION

For the foregoing reasons, the Court DENIES the Department's motion for summary judgment and GRANTS New Cingular's motion for summary judgment, in part. The Court is unable to grant summary judgment to New Cingular insofar as it seeks to have the Court order the Department to refund the use tax paid. The parties have not briefed this issue and, as noted in the Department's administrative orders, there remain factual questions regarding the amount of tax due.[16] Under separate cover, the Court will schedule a case management conference with the parties to develop a case management plan regarding any and all issues that remain.

So ORDERED this 31 day of March, 2026.

_____
Justin L. McAdam
Judge, Indiana Tax Court

---

[16] Today's decision only addresses whether Indiana Code § 6-2.5-5-13 exempts New Cingular's use of cell phones to fulfill its contractual obligations. It does not speak to whether any tax consequences arise for other parties involved in the transaction of transferring the phones to New Cingular's customers (*e.g.*, for New Cingular's customers, insurance provider, or insurance administrator). For instance, as the Department noted in its first administrative denial, New Cingular's customers who received phones in exchange for executing a service contract may owe sales tax on the acquisition of the phones received. (*See* Jt. Stip. Ex. A at 2; Jt. Stip. Ex. B at 2.) Such questions are beyond the scope of the Court's decision.

Distribution:

Benjamin A. Blair, Lydia A. Golten, Stephen J. Reen, Michelle R. Wyatt